# 24-228

## United States Court of Appeals

*for the*

## Second Circuit

SAUL KLEIN,

*Petitioner-Appellant,*

– v. –

ALTARA RK INVESTMENTS LIMITED, ALTARA NK INVESTMENTS LIMITED,
BAHIA VV NK LTD, BAHIA VV RK LTD,

*Movants Appellees,*

MICHAEL KLEIN,

*Interested Party-Appellee,*

EK-VV LIMITED; KIRELAND 83RD STREET CHICAGO, LLC; KIRELAND
BELVIDERE STREET WAUKEGAN, LLC; KIRELAND COMMERCIAL AVE CHICAGO,
LLC; ET AL.,

*Respondent-Intervenor-Appellees,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**OPENING BRIEF AND SPECIAL APPENDIX FOR THE PETITIONER-APPELLANT**

Gabriela M.B. Scanlon
MB Scanlon PLLC
4301 50th Street NW
Washington, DC 20016
Tel. (215) 459-1171
*Attorney for Petitioner-Appellant*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES ........................................................... iii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ...................................................4

ISSUE PRESENTED FOR REVIEW ................................................5

STANDARD OF REVIEW ...............................................................6

STATEMENT OF THE CASE...........................................................6

    I.     FACTUAL BACKGROUND ................................................7

         A. Samuel Klein, His Business Empire, and His Heirs ........................7

         B. Initiation of the Probate Proceeding and the MOU ........................9

         C. The Accounting Proceeding..........................................11

         D. Saul's Discovery of Apparent Wrongdoing by Michael ..............12

         E. Saul's Institution of Civil Proceedings in Brazil ..........................14

         F. Saul's Institution of Criminal Proceedings in Brazil ....................15

         G. Saul's Contemplated Proceedings in Brazil..................................16

    II.    SAUL'S SECTION 1782 APPLICATION AND THE
         PROCEDURAL HISTORY IN THE DISTRICT COURT ...............16

         A. Saul's Section 1782 Application....................................16

         B. The Motions to Quash.................................................18

         C. The District Court's Order Granting the Motions to Quash ..........18

SUMMARY OF THE ARGUMENT ....................................................21

ARGUMENT ...........................................................................23

    A. The District Court Committed Reversible Error with Regard to the First Intel Factor...................................................27

    B. The District Court Committed Reversible Error with Regard to the Second Intel Factor. ............................................33

    C. The District Court Committed Reversible Error with Regard to the Third Intel Factor. .............................................36

    D. The District Court Committed Reversible Error with Regard to the Fourth Intel Factor...............................................40

    E. Saul's Application Satisfied the Statutory Requirements of Section 1782....................................................................44

CONCLUSION ........................................................................46

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*In re Abraaj Investment Management Ltd.,*
    2023 WL 2674752 (S.D.N.Y. Mar. 29, 2023) ................................................... 43

*In re Accent Delight International Ltd.*,
    869 F.3d 121 (2d Cir. 2017) ................................................... 24

*In re Application of Hornbeam Corp.*
    2014 WL 8775453 (S.D.N.Y. Dec. 24, 2014) ................................................... 29

*In re Application of Johannes Roessner,*
    2021 WL 5042861 (S.D.N.Y. Oct. 29, 2021) ................................................... 37

*In re Application of Lake Holding & Finance S.A.,*
    2021 WL 2581427 (S.D.N.Y. June 23, 2021) ............................................ 29, 33

*In re Application of Setraco Nigeria Ltd.,*
    2013 WL 3153902 (M.D.Fla., 2013) ................................................... 29

*In re Banco Santander (Brasil) S.A.,*
    2022 WL 1546663 (S.D.N.Y. Apr. 6, 2022) ................................................... 43

*Brandi-Dohrn v. IKB Deutsche Industriebank AG,*
    673 F.3d 76 (2d Cir. 2012) ............................................ 24, 26

*In re Caterpillar Creditó,*
    2023 WL 6938264 (S.D.N.Y. Oct. 20, 2023) ................................... 28, 31, 37

*In re Chevron Corp.,*
    633 F.3d 153 (3d Cir. 2011) ................................................... 45

*Chevron Corp. v. Berlinger,*
    629 F.3d 297 (2d Cir. 2011) ................................................... 5

*In re Edelman*,
    295 F.3d 171 (2d Cir. 2002) ................................................... 24

*Federal Republic of Nigeria v. VR Advisory Services, Ltd.,*
    27 F.4th 136 (2d Cir. 2022) ................................................... 7

iii

*In re Fernando Celso de Aquino Chad,*
2019 WL 2502060 (S.D.N.Y. June 17, 2019) ....................................................43

*In re Furstenberg Fin. SAS,*
2018 WL 3392882 (S.D.N.Y. July 12, 2018).........................................29, 31, 32

*Intel Corp. v. Advanced Micro Devices, Inc.*
542 U.S. 241 (2004)....................................................................................passim

*In re Iraq Telecom Ltd.,*
2019 WL 3798059 (S.D.N.Y. Aug. 13, 2019)............................................29, 32

*Kiobel ex rel. Samkalden v. Cravath, Swaine & Moore LLP,*
895 F.3d 238 (2d Cir. 2018) ..................................................................................32

*Lopes v. Lopes,*
180 F. App'x 874, 877-78 (11th Cir. 2006)........................................................29

*Mangouras v. Squire Patton Boggs,*
740 F. App'x 757 (2d Cir. 2018) ........................................................................24

*In re Niedbalski,*
2023 WL 5016458 (S.D.N.Y., 2023)...................................................................43

*In re Porsche Automobil Holding SE,*
2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) ......................................................25

*In re Rodriguez Guillen,*
2020 WL 3497002 (S.D.N.Y. June 29, 2020) ....................................................41

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP,*
376 F.3d 79 (2d Cir. 2004) .................................................................................32

**Statutes**

28 U.S.C. § 1291 ........................................................................................................4

28 U.S.C. § 1331 ........................................................................................................4

28 U.S.C. § 1782 ..................................................................................................passim

**Other Authorities**

Federal Rule of Appelate Procedure 4(a)(1)(A) ........................................................4

Federal Rule of Civil Procedure 26 ...........................................................................4

## INTRODUCTION

Saul Klein ("Saul") seeks discovery from financial institutions and wire-transfer clearinghouses in the Southern District of New York for use in Brazilian proceedings where he alleges that certain of his family members misappropriated huge sums of money from his late father's estate. Specifically, Saul alleges that his brother, Michael Klein ("Michael"), fraudulently transferred hundreds of millions of dollars to the United States through various entities, including entities owned and controlled by Michael's children—all to deprive Saul of his fair share of the family's wealth. The district court initially granted Saul's Section 1782 application and authorized Saul to issue subpoenas to the Clearing House Payments Company LLC ("CHIPS"), the Federal Reserve Bank of New York (the "Federal Reserve"), and several financial institutions. None of the Respondents/subpoena recipients has ever even entered an appearance in the district court or here, let alone argued that the evidence sought does not exist, is overly burdensome or intrusive, or that the subpoenas should be quashed or Saul's Section 1782 application de denied.

Michael and the companies associated with him and his family members, on the other hand, did enter appearances in the district court and move to quash the subpoenas, seeking to block Saul's attempt to obtain discovery into the large fortune that Michael is alleged to have spirited out of Brazil and into the United

States. In granting those motions to quash, the district court committed several reversible errors that misconstrued the facts and law applicable to this case. Just two examples are set forth below:

First, the district court erroneously held that, although the subpoenas were directed at CHIPS, the Federal Reserve, and various financial institutions, Michael and his associated companies were the real parties in interest because they are the accountholders at the subpoenaed financial institutions; therefore, Saul should seek the records in Brazil, rather than here. The problem with this analysis is that it is wrong. Michael and his companies are *not* the real parties in interest, and they do *not* have all the records sought in Saul's subpoenas. Indeed, the district court simply ignored that CHIPS and the Federal Reserve act as clearinghouses for dollar-denominated wire transfers, not holders of accounts for Michael or his associated companies. Neither Michael nor any of his companies would have *any* records in the possession of CHIPS or the Federal Reserve, much less all of them. Moreover, the subpoenaed financial institutions in the United States that *do* hold accounts in the name of Michael and his associated companies undoubtedly have additional financial records that Michael and his companies do not have. For example, the financial institutions have internal wire-transfer records, IP address records, and records of what type of identification was used for certain transactions. Michael and his companies

2

are likely to have only statements and possibly canceled checks. Moreover, the financial institutions lack the incentive to conceal any records, which Michael and his companies certainly have, given the serious allegations of fraud in Brazil. In short, Michael and his companies are not the real parties in interest; the financial institutions are, and the district court erred in finding otherwise.

Second, the district court erred in ruling that Saul's Section 1782 application should be denied as unduly burdensome. Not only have none of the Respondent financial institutions asserted any burden arguments (or even appeared in these Section 1782 proceedings), but Saul's application is typical of similar Section 1782 applications that Southern District of New York courts routinely grant. Saul seeks from CHIPS and the Federal Reserve records of dollar-denominated transactions that undoubtedly occurred in the United States so that he can trace the money taken out of Brazil. In addition, Saul seeks records from several large financial institutions that are likely to have records of the funds and transfers. Indeed, Saul provided specific information about certain Respondent banks that are likely to have responsive information regarding the approximately $470 million dollars in U.S.-based transactions that Michael and his companies engaged in. Perhaps even more significantly, the district court admitted that "the records sought are likely not onerous to

unearth." (App SPA 26.)[1] Under these circumstances, a holding that the discovery sought is unduly burdensome completely misconstrues the facts and law of this case.

In short, the district court's decision must be vacated because it held Saul's Section 1782 application to a far more restrictive standard than is permitted under controlling law, and it has created fodder for all future foreign and domestic litigants who would use it to improperly stymie discovery into perhaps the most important information in any large fraud case—financial records from banks and other institutions in the Southern District of New York, the financial capital of the world. The decision must not stand.

## JURISDICTIONAL STATEMENT

Petitioner-appellant Saul brought this action under 28 U.S.C. § 1782. Consequently, the district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1782.

On December 21, 2023, the district court entered an order granting the motions to quash filed by movants-appellees and respondent-intervenor-appellees. Saul's notice of appeal was timely filed on January 19, 2024, in accordance with Federal Rule of Appellate Procedure 4(a)(1)(A). This Court

---

[1] Citations to "A __" are to the Appendix, and citations to "SPA __" are to the Special Appendix.

has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 because the appeal is from an order that ended the Section 1782 proceedings below. *See Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011) (An "order granting or denying discovery that constitutes the final resolution of a petition to take discovery in aid of a foreign proceeding under 28 U.S.C. § 1782 . . . is the final adjudication of the §1782 application" and is "immediately appealable under § 1291".).

## ISSUE PRESENTED FOR REVIEW

Whether the district court erred as a matter of law and/or abused its discretion in denying Saul's Section 1782 application on the ground that the discretionary factors set forth in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004), weigh against granting the application, where Saul established that (i) the Respondents (CHIPS, the Federal Reserve, and several financial institutions) are not parties to the foreign proceedings, would not be parties to the contemplated foreign proceeding, and have records that are different and additional to the entities that are parties to the foreign proceedings, (ii) the foreign tribunals would be receptive to the discovery sought in the Petition, (iii) Saul is not seeking to circumvent foreign proof-gathering restrictions or other policies of Brazil or the United States, and (iv) none of the

5

Respondents even argued, let alone put forth any evidence to show, that the discovery sought in the Petition is unduly intrusive or burdensome?

## STANDARD OF REVIEW

A district court's application of the factors set forth in *Intel* is reviewed for an abuse of discretion. *Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 147 (2d Cir. 2022). An abuse of discretion occurs if the district court "(1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that . . . 'cannot be located within the range of permissible decisions.'" *Id.*

## STATEMENT OF THE CASE

On June 28, 2023, Saul filed an *ex parte* application pursuant to Section 1782 to take discovery in the Southern District of New York from CHIPS, the Federal Reserve, and certain financial institutions for use in proceedings that are pending and contemplated in Brazil. (A 13.) On July 10, 2023, the district court entered an order granting Saul's *ex parte* Section 1782 application, and Saul served subpoenas on the Respondents. (A 586–587.) On August 11, 2023, Michael and companies he controls moved to quash the subpoenas. (A 590.) On August 21, 2023, companies controlled by Michael's children likewise moved to quash. (A 958.)

On December 21, 2023, the district court (Engelmayer, J.) granted the motions to quash on the ground that the *Intel* discretionary factors weighed against granting the discovery sought. (SPA 1.)

# I. FACTUAL BACKGROUND

This appeal arises from Saul's efforts in Brazil to vindicate his rights as an heir of the late Samuel Klein ("Samuel"), Saul's father and a legendary Brazilian businessman who founded the *Casas Bahia* retail chain.

## A. Samuel Klein, His Business Empire, and His Heirs

Samuel was born in Poland in 1923 to a Jewish family and survived the Auschwitz concentration camp. In 1951, Samuel left Europe and ultimately settled in Brazil with his wife, Mrs. Chana Klein, and his first-born son, Michael. Approximately six years after his arrival in Brazil—and after the births of two more children, Saul and Eva—Samuel purchased "Casa Bahia," a retail store located in a small town in the State of São Paulo. (A 24–25; A 76 ¶¶ 12–13.) Less than a decade after opening the first "Casa Bahia" store, Samuel had grown the business to a chain of 10 *Casas Bahia* stores. By 2003, *Casas Bahia* had 340 physical stores and approximately 20,000 employees. (A 24–25; A 77 ¶ 17.)

In 2009, *Casas Bahias* began negotiations to sell the company's retail business to a third party. Saul did not agree with the proposed sale and left the business. (A 25; A 78 ¶ 18.) Samuel purchased Saul's shares in the business,

thus making Samuel the owner of 54% of the company's capital stock. The remaining 46% of the company's capital stock was split between Michael and Eva, each with 23%. (A 25-26; A 78 ¶ 20.) Saul's exit from the family business also led Samuel to donate a portion of his assets equally to his children, Saul, Michael, and Eva. (A 27; A 78 ¶ 21.) In a 2009 public testament, Samuel donated 2.1 billion Brazilian reais equally to his children. (A 27; A 78 ¶ 21.)

In 2013, Michael became the controlling shareholder of *Casas Bahia*. That same year, Michael assigned 271 million shares in the company to Altara RK and Altara NK, New Zealand companies owned by Michael's two eldest children. (A 27; A 78 ¶ 24; A 296 ¶¶ 17–18.)

Also in 2013, Samuel signed a new will that differed significantly from the 2009 public testament. Instead of dividing Samuel's estate equally among his children, the 2013 will significantly favored Michael and Michael's children (Samuel's grandchildren). (A 27, A 296 ¶ 20; A 360; A 477.) Under this new will, only 50% of Samuel's estate would be left in equal shares to Samuel's three children—Michael, Saul, and Eva. The remaining 50% would be left to Michael and the two New Zealand companies owned by Michael's children—Altara RK and Altara NK. (A 27; A 296 ¶ 20; A 360; A 477.)

In January 2014, Samuel assigned 434.6 million shares in *Casas Bahia* to Twins-CB, a New Zealand company controlled by Michael. (A 27; A 297 ¶ 21;

8

A 477.) This number of shares corresponded to about half of Samuel's interest in the company, thus reducing Samuel's ownership interest to 22.25% and increasing Michael's ownership interest. (A 27; A 297 ¶ 22; A 477.)

On November 20, 2014, Samuel passed away. (A 19; A 80 ¶ 25; A 297 ¶ 23.)

### B. Initiation of the Probate Proceeding and the MOU

On January 15, 2015, Samuel's probate proceeding was filed ("the Probate Proceeding"). (A 20; A 83 ¶ 37; A 142.) On February 12, 2015, the Probate Court issued an order naming Michael as Samuel's estate administrator, thus allowing Michael to oversee and have full control over Samuel's substantial assets. (A 33; A 83 ¶ 40; A 173.) As set forth in section 618 of the Brazilian Civil Procedure Code, the estate administrator is responsible for acting on behalf of the estate actively and passively, and accounting for all assets and rights that were property of the deceased. (A 33; A 84 ¶ 40.)

Before the Probate Court issued any rulings on the accounting of Samuel's assets and rights, the heirs reached an amicable resolution concerning their shares of Samuel's fortune. (A 33-34; A 84 ¶ 41; A 178.) On March 12, 2015, Samuel's heirs signed a memorandum of understanding (the "MOU"), which purported to account for the assets of the deceased and the general terms of the asset-split among his heirs. (A 34; A 84 ¶ 41; A 178.)

9

Although the assets set forth in the MOU that purportedly constituted Samuel's estate were far lower than the 2.1 billion Brazilian reais discussed in Samuel's 2009 public testament, Saul signed the MOU, being completely in the dark about his father's financial affairs. (A 34; A 84 ¶ 43.) The MOU listed Samuel's purported assets as 500 million Brazilian reais, divided as follows:

- Saul: approximately 300 million Brazilian reais

- Eva: approximately 84 million Brazilian reais

- Michael: approximately 72 million Brazilian reais

- Altara RK: approximately 21 million Brazilian reais

- Altara NK: approximately 21 million Brazilian reais

(A 36; A 85 ¶ 46; A 182,191.)

The MOU also included a clause entitled "Jurisdiction," that states: "The parties elect the jurisdiction of the Judicial District of São Caetano do Sul, waiving any other, as privileged as it may be, to resolve any issues that may arise from this Memorandum." (A 193.)

In December 2015, an individual claiming to be Samuel's biological son (the "surprise heir") filed a complaint in the Probate Proceeding, seeking to be recognized as an heir. (A 88 ¶ 54.) This complaint prevented the Probate Court from ratifying the MOU. (A 88; A 360 ¶¶ 16,20.) To date, the MOU has not

10

been ratified, and no final order on the asset-split has been entered. (A 88; A 838 ¶¶ 5–6; A 1071; A 1092 ¶ 30.)

### C.    The Accounting Proceeding

Over the years following the appearance of the surprise heir, the relationship between Michael and Saul deteriorated, and eventually Saul took action to monitor his brother's actions as Samuel's estate administrator.

On May 11, 2020, in compliance with an order from the Probate Court, Michael initiated an accounting proceeding (the "Accounting Proceeding") to account for his years as the estate's administrator. In the Accounting Proceeding, Michael produced to the Probate Court only documents related to his father's assets located in Brazil. (A 39; A 89–90 ¶¶ 61–32; A 249.) When asked about foreign assets, Michael denied that any existed and stated that his father's estate was limited to 500 million Brazilian reais. (A 39; A 89–90 ¶¶ 61–32; A 249.) The Probate Court accepted these assertions. (A 39; A 90 ¶ 62.)

The Accounting Proceeding is ongoing and in a procedural stage during which Saul and the other heirs can still introduce evidence to show that Michael, as the estate's administrator and in control of the financial investments Samuel held at the time of his death, concealed foreign assets from the Probate Proceeding. (A 39; A 90 ¶ 63; A 679.)

### D.    Saul's Discovery of Apparent Wrongdoing by Michael

In 2022, Saul became increasingly more suspicious of Michael's role as an executor of Samuel's estate.    Saul began to ask Michael questions about Michael's potential involvement in concealing the assets of his father estate.  (A 29–31; A 75 ¶ 8; A-82 ¶ 34; A 111; A 295 ¶ 8, ¶¶ 27–29.)  Indeed, in 2009, when Samuel notarized his previous will, Samuel's assets were worth slightly more than 2 billion Brazilian reais.  (A 31; A 80 ¶ 29.)  Just five years later, when Samuel signed his second will, Samuel's estate purportedly amounted to less than a quarter of that amount: approximately 500 million Brazilian reais.  (A 31; A 80 ¶ 29.)

Saul began to investigate his father's name, companies, and businesses using different asset-searching tools to see whether Samuel had assets located abroad.  (A 31; A 75 ¶ 8; A-82 ¶ 34; A 111; A 295 ¶ 8, ¶¶ 27–29.)  Saul discovered that his father was listed among the 22 Brazilian wealthy businessmen whose names leaked through the Panama Papers.  (A 31; A 80 ¶ 30.)  Specifically, Samuel was the director of Haifa International Corporation, a Panamanian company that held bank accounts at Santander Private Banking.  (A 31; A 81 ¶ 30.)

After learning the above facts, Saul hired a new Brazilian legal team, which identified questionable corporate changes that occurred very late in

Samuel's life and that massively benefited Michael and his family, at the expense of Saul. (A 31; A 75 ¶ 8; A-82 ¶ 34; A 111; A 295 ¶ 8, ¶¶ 27–29.) For example, the corporate change that resulted in 271 million shares in *Casas Bahia* being transferred to Altara RK and Altara NK, New Zealand companies owned by Michael's two eldest children, occurred on August 14, 2013, just 10 days before Samuel was admitted to the hospital for 17 days. (A 35; A 81 ¶ 31; A 1066; A 298 ¶¶ 27–31.) On the same day as the stock transfer, Samuel issued his new will, which added Altara RK and Altara NK as beneficiaries, greatly reduced the amount that would be distributed to Saul, and greatly increased the amount that would be distributed to Michael. (A 27; A 296 ¶ 19; A 1066.)

An expert hired by Saul further concluded that Samuel's signatures on both the 2013 will, the 2013 stock transfer, and on other stock transfers and corporate changes that benefited Michael to the detriment of Saul were forged. (A 29; A 298 ¶ 19; A 678; A 797.)

A private investigator hired by Saul in 2023 further discovered that companies associated with Michael, his children, and Eva had acquired substantial assets in the United States from 2012 through the beginning of 2015, when the MOU was signed. (A 31; A 82 ¶ 34; A 111; A 947.) The investigator produced a report that details a list of over 70 companies, many of whose names are variations on "MK _____," EK _____," "Mikeone _____," and "Samkle

13

_____," and most of which listed an individual named "Alex Kurki" as a manager or representative. (A 947.) Alex Kurkin is the same person who is listed on corporate documents for Altara RK and Altara NK. (A 34; A 81 ¶ 31; A 84 ¶ 35.) These companies purchased vast amounts of real estate in the United States in transactions denominated in U.S. dollars at times corresponding to significant events in Brazil. (A 31; A 82 ¶ 34; A 111; A 947.) Indeed, on March 13, 2015, a day after the MOU was signed, "Mikeone M Street Holding LLC" purchased a property in Washington, DC, for $109 million dollars. (A 949 ¶ 13.) In total, these companies associated with Michael and his family acquired approximately $470 million dollars in real estate in the United States between 2012 and 2015, $310 million of which was purchased between October 2014 and March 2015—dates that coincide with Samuel's death and the signing of the MOU. (A 954; A 1076.)

### E.    Saul's Institution of Civil Proceedings in Brazil

In April 2023, Saul instituted three preliminary discovery proceedings in Brazil seeking documents from Michael, *Casas Bahia*, and his father's estate regarding, among other things, accounting information and information about certain transfers of stock from Samuel in the time immediately before his death. (A 40; A 91–92.) The proceedings were dismissed on procedural grounds. Saul has appealed the dismissals. The São Paulo appellate court did reverse one of

14

the proceedings and the other two remain pending for the appellate court's review.  (A 1072; A 1107 ¶¶ 60–61; A 1201)

### F.    Saul's Institution of Criminal Proceedings in Brazil

In June 2023, Saul filed a formal complaint with the 78th Police District of São Paulo to initiate a criminal investigation in accordance with Section 5, item II, of the Brazilian Code of Criminal Procedure.  The allegations in the complaint were based on Saul's expert evidence showing that Samuel's signatures were forged (i) on certain corporate actions of *Casas Bahia* that resulted in stock being transferred from Samuel to Michael's family members, and (ii) on Samuel's 2013 will.  (A 41; A 299 ¶ 39.)  Such alleged forgeries benefited Michael and harmed Saul.  (A 41; A 76; A 299 ¶ 40.)

On June 7, 2023, the Chief of the Civil Police of the São Paulo 78th Police District granted Saul's request and ordered the immediate initiation of a police investigation under the following terms:

> [C]onsidering the seriousness of the facts reported in the application, as well as the findings in the retained expert's opinions presented, I see a probable cause that the crime of theft by deception has been committed by Michael Klein.  I order that a police investigation be initiated to examine the circumstances.

15

(A 299 ¶41.)  The Criminal Proceeding remains pending.  (A 1078.)

### G.  Saul's Contemplated Proceedings in Brazil

Saul intends to file an annulment lawsuit with the State Court in São Caetano do Sul arguing that he was deceived and induced to error when signing the MOU.  (A 42–43; A 1072; A 1077–1078.)  If Saul had known of the true total amount of assets held by his late father at the time of his death, Saul never would have agreed to sign the MOU.  (A 1065–1066.)

## II.  SAUL'S SECTION 1782 APPLICATION AND THE PROCEDURAL HISTORY IN THE DISTRICT COURT

### A.  Saul's Section 1782 Application

On June 28, 2023, Saul filed an *ex parte* application for an order under 28 U.S.C. § 1782 permitting Saul to issue subpoenas to CHIPS, the Federal Reserve, and several financial institutions.  (A 13.)  The Section 1782 Application sought financial records concerning Samuel, Michael, Eva, and numerous companies associated with them and their families that Saul identified as being in the United States and/or engaging in financial transactions here, including but not limited to Altara RK, Altara NK, Twins-CB, and several companies with variations on the names "EK _____" and "Mikeone _____."  (A 34.)

Saul's Section 1782 Application satisfied the three statutory requirements of Section 1782.  (A 45–49.)  Specifically, CHIPS, the Federal Reserve, and

16

several of the financial institutions "are found" in this district; the requested discovery is "for use" in the Probate Proceeding, the Criminal Proceeding, and the Contemplated Proceeding in Brazil; and Saul is or would be a party to the foreign proceedings, thus making him an "interested person" in the proceedings for purposes of Section 1782. (A 45–49.)

In addition, Saul demonstrated that the four discretionary factors set forth in *Intel* weigh in favor of granting the Application. (A 49–53.) Neither CHIPS, the Federal Reserve, nor any of the financial institutions named in the Application are or will be parties to the foreign proceedings; the Brazilian courts are receptive to the discovery sought in the Section 1782 Application and discovery gathered in the United States generally; Saul seeks the discovery in good faith, and granting the Application would not circumvent foreign proof-gathering restrictions; and the discovery requested is not unduly intrusive or burdensome. (A 49–53.)

On July 10, 2023, the district court authorized Saul to serve the subpoenas, which he proceeded to serve on all Respondents. (A 586.) To date, none of the Respondents has appeared in the Section 1782 proceedings, let alone argued that the evidence sought is burdensome, the subpoenas should be quashed, or the Section 1782 Application should be denied.

17

## B.    The Motions to Quash

On August 11, 2023, Michael and entities that he and Eva own and control filed a motion to quash the subpoenas.  (A 590.)  On August 23, 2023, entities owned and controlled by Michael's children filed a motion to quash the subpoenas.  (A 958.)  (This brief will refer to the sets of parties who moved to quash collectively as the "Movants.")  The motions to quash argued that Saul had failed to satisfy two of the three statutory requirements—conceding only that Saul is an "interested party" in the foreign proceedings—and contended that all four discretionary factors set forth in *Intel* weigh in favor of denying the Application.  (A 608–619; A 969–970.)

Saul opposed both motions, and certain of the Movants replied.  (A 673; A 1060; A 1136.)

The district court held oral argument on November 14, 2023, (A 1283), after which the parties submitted letters to the district court, (A 1221; A 1281).

## C.    The District Court's Order Granting the Motions to Quash

On December 21, 2023, the district court entered an order granting the motions to quash.  (SPA 1.)

The district court discussed the statutory requirements of Section 1782 but did not rule on them, except to find that Saul had failed to establish that four of

18

the financial institutions are "found in" the district.[2] (SPA 12–13.) The district court instead stated that certain issues regarding the statutory requirements were a close call and then assumed Saul had satisfied them. (SPA 16.)

The district court then proceeded to base its decision to quash the subpoenas on the ground that the *Intel* factors weigh against granting the Application. (SPA 19.)

Specifically, the district court found that the first *Intel* factor weighs against Saul because, "in substance, he seeks records of the parties: the bank records of Michael and his adversaries in the Brazilian probate proceedings." (SPA 20.) According to the district court, "a ruling otherwise would invite foreign parties to end-run directly seeking discovery from their adversaries in the foreign proceeding by serving § 1782 subpoenas on the adversaries." (SPA 21.)

The district court continued by finding that the second *Intel* factor is neutral because "the one outstanding issue before the Brazilian probate court concerns [the surprise heir's] claim of Samuel's paternity," and therefore the "requested discovery will be at best peripheral." (SPA 22.) The district court then went on to rule that the requested discovery "may well be germane" to

---

[2] Saul does not appeal this aspect of the district court's ruling.

Saul's contemplated proceeding to invalidate the MOU, but "Saul's argument is weakened by the fact that no such proceeding is underway." (SPA 22.)

The district court further found that the third *Intel* factor weighs against Saul's application "but only slightly" because "the MOU contains an exclusive jurisdiction clause." (SPA 23.) According to the district court, "to allow Saul to pursue discovery in the United States would arguably allow him to sidestep the exclusive forum that he agreed would arbitrate disputes among him and his siblings," but "the forum selection clause does not textually preclude use of vehicles like § 1782 to procure discovery abroad[, a]nd the case law does not categorically hold such clauses to foreclose all foreign discovery." The district court thus found that the "MOU's exclusive-jurisdiction clause, though not preclusive . . . weighs against Saul's application." (SPA 23.)

Finally, the district court found that the fourth *Intel* factor weighs heavily against Saul because Saul could not show, with particularity, why the financial institutions would have responsive records, and therefore "Saul's application presents an archetypal fishing expedition." (SPA 25.) The district court did note that "[t]he banks have not claimed a production burden" and that "the records sought are likely not onerous to unearth." (SPA 26.) But, the district court ultimately concluded that Saul's inability to provide "a non-speculative basis to

believe that an entity relevant to the litigation had done business with the bank"
was determinative.  (SPA 26.)

## SUMMARY OF THE ARGUMENT

The district court provided four reasons for denying Saul's Section 1782
Application, each of which was based on legal errors and/or based on clearly
erroneous factual findings.

First, the district court erred in holding that the first *Intel* factor—whether
the person from whom discovery is sought is a participant in the foreign
proceeding—weighs against Saul's Application on the ground that Michael and
his related companies, not the banks, are the real parties in interest, and,
therefore, Saul could have and should have sought the records in Brazil, not
here.  Such a ruling runs directly counter to the overwhelming weight of
authority concluding that financial records are records of the financial
institution, not of the institution's customers, and therefore the first *Intel* factor
weighs in favor of *granting* an application, not denying it, where, as here, the
Section 1782 applicant seeks his foreign-litigation adversary's financial records
from a domestic financial institution.

In addition, the financial institutions will have additional and more
complete records than Saul's foreign-litigation adversaries.  In fact, certain of
the Respondents will have records that none of Saul's foreign-litigation

adversaries have. Respondents CHIPS and the Federal Reserve, for example, act as clearinghouses for dollar-denominated wire transfers between domestic and international banks, not as holders of accounts for Michael and entities associated with him and his family members. (A 24; A 1076.)

Second, the district court erred in holding that the second *Intel* factor— whether the foreign tribunal is receptive to the discovery sought—is neutral on the grounds that (i) the only issue outstanding before the Brazilian probate court is unrelated to the discovery sought in Saul's Application and (ii) Saul has yet to file his Contemplated Proceeding in Brazil. The district court is wrong about the issues pending before the Brazilian probate court; those issues include Saul's claim that Michael intentionally concealed assets that should have been added to Saul's inheritance. In addition, the district court's conclusion that Saul should be penalized for not yet filing his Contemplated Proceeding is unfounded; Saul intends to file the action, and he will use the evidence gathered in his Section 1782 Application to prove his claims in it—something that the district court conceded he would likely be able to do.

Third, the district court erred in holding that the third *Intel* factor— whether the Section 1782 application conceals an attempt to circumvent foreign proof-gathering restrictions—weighs slightly against Saul's Application because the MOU contains a forum selection clause. The existence of a forum selection

22

clause falls far short of the "authoritative proof" required to show that the Brazilian tribunals would reject the evidence produced pursuant to § 1782. Indeed, just the opposite is true. Saul has provided evidence that the Brazilian tribunals *would* accept the evidence gathered in this Section 1782 proceeding.

Fourth, the district court erred in holding that the fourth *Intel* factor—whether the Section 1782 subpoenas are unduly intrusive or burdensome—weighs heavily against Saul's Application because Saul failed to adequately connect the Respondent institutions to accounts or transactions involving Samuel, Michael, Eva, and/or the various entities linked to them. (SPA 25.) Not only did Saul provide an adequate basis for concluding that the Respondent financial institutions have records of transactions involving Samuel, Michael, Eva, and/or the various entities linked to them, but he also showed that any burden on the Respondent banks is minimal, not intrusive. Indeed, courts in this circuit routinely grant similar Section 1782 applications seeking records from numerous banks and CHIPS. Under these circumstances, a holding that the discovery sought is unduly burdensome completely misconstrues the facts and law of this case.

## ARGUMENT

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for

use in foreign tribunals." *Intel*, 542 U.S. at 247. Beginning with the adoption of a system of letters rogatory in 1855, and continuing with the enactment of the original Section 1782 in 1948, the revisions of the statute in 1948 and 1949, the "complete revision" of Section 1782 in 1964, and the most recent amendment in 1996, Congress has continually expanded the scope of federal courts' ability to provide assistance in gathering evidence for use in foreign tribunals. *Id.* at 247-49.

As explained by the Supreme Court of the United States, Section 1782 has two aims: (i) "providing efficient assistance to participants in international litigation"; and (ii) "encouraging foreign countries by example to provide similar assistance to our courts." *Id.* at 252. Consequently, both the Supreme Court and this Court have acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *id.* at 247-48; *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) ("The goals of the statute are to provide 'equitable and efficacious' discovery procedures in United States courts 'for the benefit of tribunals and litigants involved in litigation with international aspects.'"); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . ."); *Accent Delight Int'l Ltd.*, 869 F.3d 121, 134 (2d Cir. 2017) ("The availability of Section 1782 discovery therefore is quite

24

broad and only has broadened through successive amendments over the years.").

This liberal view of Section 1782 discovery is intended to solidify the United States as a helpful world citizen and encourage other countries to reciprocate when U.S. litigants seeks discovery abroad for use here:

> As a general matter, the Supreme Court and the Second Circuit have made clear that district courts are to take a hospitable view of applications to compel the production of evidence by persons found or residing in the United States for use in foreign litigation. That hospitality derives from Congress's desire to make the United States a helpful world citizen and, moreover, in the hope of obtaining similar receptivity abroad to efforts by litigants in American courts to obtain evidence located in other countries.

*In re Porsche Automobil Holding SE*, 2016 WL 702327, at *2 (S.D.N.Y. Feb. 18, 2016).

In evaluating an application under Section 1782, courts typically begin by determining whether the application satisfies three statutory requirements: "(1) the person from whom discovery is sought resides (or is found) in the district [where] the application is made, (2) the discovery is for use in a foreign

proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn*, 673 F.3d at 80. After determining that the three statutory requirements are satisfied, courts must then consider four discretionary factors in deciding whether to grant a Section 1782 application: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which case "the need for § 1782(a) aid generally is not as apparent"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264–65.

Because the district court concluded that the discretionary factors weigh in favor of denying Saul's Section 1782 Application, it did not fully address the statutory requirements.[3] (SPA 11.) To the extent that the district court did

---

[3] The district court discussed but did not rule on the "for use" requirement. (SPA 13–18.) As discussed below, Saul's application satisfies that requirement, and this Court should so rule. No party even challenged that Saul satisfies the third statutory requirement—that Saul is an interested person in the foreign proceedings—because he is or would be a party to the Probate Proceeding, the

26

definitively rule on the statutory requirements, the court either ruled in favor of Saul or ruled against Saul only with respect to specific Respondents, and Saul does not appeal those rulings.[4]  (SPA 11–13.)  Saul appeals only the district court's rulings on the discretionary factors set forth in *Intel*.

## A.   The District Court Committed Reversible Error with Regard to the First Intel Factor.

The district court concluded that, although Saul "subpoenaed only *non parties*" to the foreign proceedings, "in substance, he seeks records of the *parties*: the bank records of Michael and [of Saul's] adversaries in the Brazilian probate proceedings."  (SPA 20.)  According to the district court, "such materials by definition will be financial records of the parties to the Brazilian civil proceedings (i.e., their bank statements)," and the Brazilian parties "have access to and could access them were such materials sought of them in the Brazilian

---

Accounting Proceeding, the Criminal Proceeding, and the Contemplated Proceeding.  (SPA 11.)

[4] The district court ruled that eight of the twelve subpoenaed entities are "found in" the Southern District of New York because each is incorporated in or has its principal place of business there.  (SPA 13.)  The district court further found that four subpoenaed entities either did not exist or were misnamed by Saul, or that Saul had failed to submit sufficient evidence to show that they are "found in" the district: Itaú S.A. New York Branch; Itaú Securities; Itaú CorpBanca; and Banco Santander S.A. New York.  (SPA 12–13.)  Saul does not appeal that decision, particularly as the district court noted that Saul "is at liberty to file a new § 1782 application addressed to new respondents," *i.e.* the correct bank entities.  (SPA 12.)

27

proceeding." (SPA 20.) Thus, the district court held that the first *Intel* discretionary factor weighs against Saul because "[a] ruling otherwise would .... invite foreign parties to end-run directly seeking discovery from their adversaries in the foreign proceeding by serving § 1782 subpoenas on the adversaries' U.S.-based agents or archivists." (SPA 21.)

This conclusion and the district court's factual findings supporting it are clearly erroneous and must be reversed.

Courts routinely find that financial records are records of the financial institution, not of the institution's customers, and therefore hold that the first *Intel* factor weighs in favor of *granting* an application, not denying it, where, as here, the applicant seeks his foreign-litigation adversary's financial records from a U.S. bank. *See, e.g.*, *In re Caterpillar Credító, Sociedad Anonima de Capital Variable, Sociedad Financiera de Objeto Multiple, Entidad Regulada*, 2023 WL 6938264, at *3 (S.D.N.Y. Oct. 20, 2023). In *Caterpillar*, for example, the Southern District of New York squarely rejected the argument that the first *Intel* factor weighs against an applicant who sought records from American Express regarding accounts held by the applicant's adversary in the foreign proceedings. *See id.* Such an argument, the court concluded, "is undercut by the substantial precedent in this District and elsewhere authorizing the production of records from banks where the account holder is in fact a party to the foreign proceeding." *Id.* (citing cases).

28

The Eleventh Circuit likewise rejected the argument that the first *Intel* factor weighs against applications seeking records from U.S. financial institutions about accounts held in the names of the Section 1782 applicant's foreign-proceeding adversaries. *See Lopes v. Lopes*, 180 F. App'x 874, 877-78 (11th Cir. 2006) ("The only logical reading of *Intel* points to the bank (or banks) as the 'person from whom discovery is sought,' and the District Court's application of the *Intel* factors was correct.").

These decisions are echoed by numerous other decisions that all come to the same conclusion: the first *Intel* factor weighs in favor of *granting* applications that seek records from U.S. financial institutions where the accountholder is the applicant's opponent in the foreign proceeding—not denying it. *See, e.g.*, *In re Furstenberg Fin. SAS*, 2018 WL 3392882, at *4 (S.D.N.Y. July 12, 2018); *In re Iraq Telecom Ltd.*, 2019 WL 3798059, at *4 (S.D.N.Y. Aug. 13, 2019); *In re App. of Lake Holding & Fin. S.A.*, 2021 WL 2581427, at *16-17 (S.D.N.Y. June 23, 2021); *see also In re App. of Setraco Nigeria Ltd.*, No. 13-mc-16-32, 2013 WL 3153902, at *3 (M.D. Fla. June 19, 2013) (finding the first discretionary factor to weigh in § 1782 applicant's favor when the records sought were created by the parties to a contemplated foreign proceeding but controlled by a domestic bank that would not be subject to the foreign tribunal's jurisdiction); *In re Application of Hornbeam Corp.*, No. 14-mc-424, 2014 WL 8775453, at *4 (S.D.N.Y. Dec. 24,

29

2014) (holding that first *Intel* factor favored granting discovery where "the New York Banks and Professional Services Providers are not expected to be parties to any future BVI litigation.").

These decisions are undoubtedly correct because the records in the possession, custody, or control of the financial institution are different from and more comprehensive than the records in the possession, custody, or control of the accountholder. While accountholders likely receive statements (as pointed out by the district court, SPA 20), accountholders do not receive the internal records of the banks, such as internal wire-transfer records, IP addresses associated with electronic transactions, and records of what type of identification may be have been used when engaging in certain transactions. Such records are critical to fraud claims like those asserted and contemplated in the Brazilian proceedings, where Michael and entities associated with his family members are alleged to have embezzled and fraudulently transferred hundreds of millions of dollars from Brazil to the United States through U.S. financial institutions. (A 23; A 43–44; A 299 ¶¶ 37–40; A 1075–1076) Indeed, numerous courts have recognized this difference in records between a bank and its customers when holding that the first *Intel* factor weighs in favor of granting discovery where, as here, the applicant seeks records from U.S. financial institutions about accountholders who are parties to the foreign proceeding. *See,*

30

*e.g.*, *Furstenberg*, 2018 WL 3392882, at *6 (The foreign-party-adversary/accountholder "may not have the same records—or the same quality of records—as the Banks, all of which almost certainly keep account records of wire transfers."); *Caterpillar*, 2023 WL 6938264, at *3 (same).

The district court's holding that Saul's litigation adversaries in Brazil have possession, custody, or control of the documents Saul seeks in his Section 1782 Application is particularly misguided when applied to Respondents CHIPS and the Federal Reserve. Both CHIPS and the Federal Reserve act as clearinghouses for dollar-denominated wire transfers between domestic and international banks, not as holders of accounts for Michael and entities associated with him and his family members. (A 43–44; A 1076.) Thus, the records Saul seeks from CHIPS and the Federal Reserve could not possibly be in the possession, custody, or control of Saul's litigation adversaries in Brazil. The district court's decision otherwise was clearly erroneous and must be reversed.

The district court's conclusion that the first *Intel* factor weighs against Saul's application also ignores the fact that Saul's litigation adversaries may no longer have all the financial records Saul seeks and/or may no longer have access to them. And the decision ignores the fact that Saul's litigation adversaries have an overwhelming incentive not to be forthcoming in the Brazilian proceedings. Courts in this Circuit have repeatedly cited such

31

incentives as a reason why the first *Intel* factor weighs in favor of granting Section 1782 applications filed by applicants who seek financial information from U.S. banks about accountholders who are accused of fraud in foreign proceedings. *See, e.g.*, *Furstenberg*, 2018 WL 3392882, at *6 (finding that the first *Intel* factor weighs in favor of granting the application where the applicant "allege[s] that [his foreign-proceeding adversary] has purposefully concealed . . . his ownership interest in" certain property and thus "may not be entirely forthcoming"); *Iraq Telecom Ltd.*, 2019 WL 3798059, at *4 (same).

None of the cases cited by the district court (or the Movants) involves a court finding that the real party in interest to a Section 1782 application aimed at U.S. financial institutions is the foreign-adversary accountholders. (SPA 19–21; A 613–614; A 984–985.) The cases cited by the district court and the Movants deal with the different and wholly inapposite situation where the respondent in the Section 1782 application is or was legal counsel to the party in the foreign proceeding. (SPA 20–21 (citing *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004) and *Kiobel ex rel. Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 241 (2d Cir. 2018).) Here, by contrast, Saul seeks documents from financial institutions that were generated by the financial institution—not documents from his adversaries' legal counsel that were simply handed to legal counsel by the foreign adversary. Indeed,

courts in this circuit have rejected exactly this false equivalence. *See, e.g.*, *Lake Holding*, 2021 WL 2581427, at *16-17 (rejecting Section 1782 respondents' reliance on *Schmitz* and *Kiobel* in a proceeding against banks).

The district court's finding that the first *Intel* factor weighs against Saul's application is based on clearly erroneous factual and legal conclusions and contravenes the overwhelming weight of authority, which hold that the first *Intel* factor weighs in favor of *granting* discovery where, as here, the applicant seeks financial information regarding accounts held in the names of his foreign-proceeding adversaries. The decision should accordingly be reversed.

## B. The District Court Committed Reversible Error with Regard to the Second Intel Factor.

The district court concluded that the second *Intel* factor is neutral because "the one outstanding issue before the Brazilian probate court concerns [the surprise heir's] claim of Samuel's paternity," and therefore the "requested discovery will be at best peripheral." (SPA 22.) The district court then went on to rule that the requested discovery "may well be germane" to Saul's contemplated proceeding to invalidate the MOU, but "Saul's argument is weakened by the fact that no such proceeding is underway." In an afterthought, the district court notes that "there is no indication that, were it to be initiated, a Brazilian court would categorically reject such evidence." (SPA 22.)

33

The district court's factual finding that the only outstanding issue before the Brazilian probate court concerns the paternity of the surprise heir is clearly erroneous. It ignores the evidence and argument provided by Saul showing that he intends to use the evidence he gathers in the Section 1782 proceeding in the Probate Proceeding to prove that Michael intentionally concealed assets that should have been added to Saul's inheritance. (A 19; A 84 ¶ 43; A 90 ¶63; A 93–95; A 1075; A 1099 ¶¶ 44, 47–49; A 1107 ¶ 61; 1108 ¶ 65; A 1133 ¶¶ 59–60 ].) Indeed, as demonstrated in Saul's application, the Probate Proceeding—in particular the Accounting Proceeding within it—is ongoing and in a procedural stage in which Saul can still introduce evidence to show that Michael, as the estate's administrator and in control of the financial investments Samuel held at the time of his death, concealed foreign assets from the Probate Proceeding. (A 39; A 89–90 ¶¶ 61–32; A 249.)

The district court also clearly erred in ignoring the fact that Saul intends to use the evidence gathered through his Section 1782 application in the ongoing Criminal Proceeding. (SPA17–18.)

In addition, although the district court stated the correct legal standard applicable to the second *Intel* factor, it inexplicably applied a different, far-too-stringent standard in concluding that the factor was neutral. (SPA 22.) As correctly stated by the district court:

34

The Second Circuit instructs that district courts "should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," including, for example, "a forum country's judicial, executive, or legislative declarations that specifically address the use of evidence gathered under foreign procedures."

(SPA 21–22. (quoting *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099-1100 (2d Cir. 1995).) The district court then noted that Brazilian courts would be receptive to discovery obtained through Section 1782. (SPA 22.)

But instead of applying the legal standard it announced and finding that the second *Intel* factor weighs in favor of Saul's Application, the district court baldly states that the factor is neutral because Saul has not yet filed his contemplated foreign proceeding. (SPA 22.) This conclusion is contrary to law and must be reversed.

As even the district court points out, the Brazilian courts would almost certainly be receptive to the discovery sought in Saul's Section 1782 Application. (SPA 22.) The second *Intel* factor therefore weighs in favor of granting the application, not denying it.

35

### C. The District Court Committed Reversible Error with Regard to the Third Intel Factor.

As with the second *Intel* factor, the district court announced the correct legal standard applicable to the third *Intel* factor, but then applied a different, far-too-stringent standard in concluding that the factor weighed slightly against Saul's application. (SPA 23.) As correctly stated by the district court, the third *Intel* factor—whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions—examines whether the discovery sought would be privileged or whether the applicant would otherwise be prohibited from acquiring or using it, not whether the foreign forum offers a way of discovering it there; that is, the third *Intel* factor does not impose a foreign-discoverability requirement:

> "'[P]roof-gathering restrictions' are best understood as rules akin to privileges that prohibit the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information."

(SPA 22–23 (quoting *Mees v. Buiter*, 793 F.3d 291, 303 n.20 (2d Cir. 2015) (emphasis in original)).

Despite noting this stringent standard for denying Section 1782 applications, the district court found that the factor weighs slightly against Saul's

36

application because "the MOU contains an exclusive jurisdiction clause." (SPA 23.) The district court reached this conclusion even though it noted that "the forum selection clause does not textually preclude use of vehicles like § 1782 to procure discovery abroad[, a]nd the case law does not categorically hold such clauses to foreclose all foreign discovery." (SPA 23.)

This conclusion is clearly erroneous and applies a standard that is contrary to controlling law. As stated repeatedly by this Court, in determining whether a Section 1782 application seeks to circumvent foreign proof-gathering restrictions, it is "helpful and appropriate" to determine whether there is "authoritative proof that a foreign tribunal would reject evidence obtained with the aid of § 1782." *Euromepa*, 51 F.3d at 1100; *Mees*, 793 F.3d at 303 n.20. Indeed, courts in this district routinely find that the third *Intel* factor does not weigh against production absent such "authoritative proof." *See, e.g.*, *Caterpillar*, 2023 WL 6938264, at *3 (finding that the third *Intel* factor does not weigh against production where (i) the party opposing "fail[ed] to identify <u>any</u> proof-gathering restrictions, discovery rules, or policies on which the requested subpoena encroaches," and (ii) there [is no] authoritative proof that the [foreign] Court would reject evidence produced pursuant to § 1782); *In re Application of Johannes Roessner*, 2021 WL 5042861, at *3 (S.D.N.Y. Oct. 29, 2021) (holding that *Intel* factors two and three "cut in favor of granting the application" because "[t]here

37

is no 'authoritative proof' that the [foreign] Court would reject Section 1782 assistance, and Petitioner's [foreign] counsel attests that he is 'not aware of any . . . laws or restrictions that would preclude the use of the discovery sought' in the Application").

Here, no such authoritative proof has been offered that the Brazilian tribunals would reject evidence obtained by way of Saul's Section 1782 Application. Just the opposite. Saul has provided evidence that the Brazilian tribunals *would* accept the evidence gathered in this proceeding. (A 52; A-96 ¶¶ 90–91; A 1083–1085.) As explained by the declaration of foreign counsel accompanying Saul's Application:

> There is no reason to believe that the Probate Court, Brazilian courts and the Brazilian criminal authority will be unreceptive to the evidence sought here and the request does not seek to circumvent foreign proof-gathering restrictions or other policies of Brazil. To be clear, there is no restriction or prohibition under Brazilian law for collecting and using the type of discovery that is sought here. To the contrary, there is evidence that they will be receptive of it.
>
> The Brazilian legal system allows and welcomes foreign evidence for use in Brazilian litigation. Additionally, neither

38

the Probate Court, Brazilian courts, nor the Brazilian criminal authority have restrained Petitioner from obtaining foreign evidence.

(A-96 ¶¶ 90–91.)  Such evidence demonstrates that the third *Intel* factor weighs in favor of granting Saul's Section 1782 Application, not denying it.

The district court's casual mention of a forum-selection clause in the MOU does not change this analysis.  Indeed, the district court itself noted that "the forum selection clause does not textually preclude use of vehicles like § 1782 to procure discovery abroad[, a]nd the case law does not categorically hold such clauses to foreclose all foreign discovery."  (SPA 23.)  The forum-selection clause is therefore no evidence, let alone "authoritative proof," that the Brazilian tribunals would reject evidence obtained by way of Saul's Section 1782 Application.  Indeed, there is no evidence in the record whatsoever that the Movants have even sought a ruling in the foreign proceedings that the forum-selection clause in the MOU bars Saul from pursuing his Section 1782 Application here—let alone obtained such a decision.

The district court's finding that the third *Intel* factor weighs against Saul's Application is therefore clearly erroneous and must be reversed.

39

### D. The District Court Committed Reversible Error with Regard to the Fourth Intel Factor.

The district court erred in concluding that the fourth *Intel* factor—whether the request is unduly intrusive or burdensome—weighs heavily against Saul's Application on the ground that Saul had failed to adequately connect the Respondent financial institutions to accounts or transactions involving Samuel, Michael, Eva, and/or the various entities linked to them. (SPA 25.) Again, although the district court announced the correct standard, it failed to apply it. As correctly stated by the district court, the fourth *Intel* factor applies the standards set forth in Rule 26 of the Federal Rules of Civil Procedure:

> "[W]hether a request is intrusive or burdensome should not
> be assessed based on the 'discovery scope' available in the
> foreign proceeding." [Mees, 793 F.3d at 302]. Rule 26(b)(1)
> provides that the scope of discovery is limited to "relevant"
> material that is "proportional to the needs of the case . . . and
> whether the burden or expense of the proposed discovery
> outweighs its likely benefit," among other factors. *In re Elvis
> Presley Enters.*, 2016 WL 843380, at *5 (S.D.N.Y. Mar. 1,
> 2016). "Proportionality and relevance are 'conjoined'
> concepts; the greater the relevance of the information in issue,
> the less likely its discovery will be found to be

40

disproportionate." *Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016).

(SPA 24.) But instead of applying these liberal principles, the district court held Saul an unreasonably stringent standard.

First, the district court completely ignored that Saul's Section 1782 Application seeks from CHIPS and the Federal Reserve records of dollar-denominated wire transfers between domestic and international banks. (A 24; A 43–44; A 678; A 947.) Given that Saul was able to identify approximately $470 million in dollar-denominated transactions in the United States involving Michael and the various entities linked to him and his family members, CHIPS and the Federal Reserve are virtually guaranteed to have responsive records, which can then be used to pinpoint additional accounts through which the funds passed.

Second, the district court gave short shrift to Saul's identification of two financial institutions listed on Samuel's 2014 income tax return: Citibank and Safra. (A 1221.) Although the specific entities listed on the return are Brazilian, the presence of these entities tends to show which affiliated banking institutions Samuel may have used in the United States.

Third, the district court noted, but found insignificant, that the Respondent "banks have not claimed a production burden" and that "the

41

records sought are likely not onerous to unearth given the nature of such electronically stored materials." (SPA 26 (citing *In re Rodriguez Guillen*, 2020 WL 3497002, at *3 (S.D.N.Y. June 29, 2020).) But this conclusion *is* significant. The very Respondents who have been subpoenaed have not raised any burden objections, and the district court concluded that they do not have any. Indeed, none of the Respondents/subpoena recipients has ever even entered an appearance in the district court or here, let alone argued that the evidence sought does not exist, is overly burdensome or intrusive, or that the subpoenas should be quashed or Saul's Section 1782 application de denied. (A 1085.) Under these circumstances, a holding that the discovery sought is unduly burdensome completely misconstrues the facts and law of this case.

The district court cites several cases for the proposition that courts routinely quash subpoenas that are broad and seek information that is of only marginal relevance. (SPA 26–27.) But here, Saul seeks information that is critical to the foreign proceedings: information about how and when hundreds of millions of dollars were transferred to the United States and used to buy real estate when such funds should have been part of his father's estate. (A 43–44; A 678; A 947.) Given this high relevance and low burden of production, there is no basis to conclude that the subpoenas are unduly burdensome or intrusive.

Fourth, and finally, the district court's finding that the subpoenas attached to Saul's Section 1782 Application were wildly overbroad and inappropriate runs counter to the great weight of authority in this Circuit allowing applicants to issue subpoenas to numerous financial institutions in the Southern District of New York by way of Section 1782 proceedings. *See, e.g.*, *In re Fernando Celso de Aquino Chad*, 2019 WL 2502060, at *4 (S.D.N.Y. June 17, 2019) (finding that subpoenas to several banks were not unduly burdensome or intrusive despite petitioner's inability to show that the banks actually executed transactions for the discovery subjects because of "the minimal burden of producing" and "the importance such documents may play in the" foreign proceeding); *In re Banco Santander (Brasil) S.A.*, 2022 WL 1546663, at *1, 2 (S.D.N.Y. Apr. 6, 2022) (granting Section 1782 application aimed at nine banks and CHIPS to gather evidence for use in Brazilian proceedings alleging fraudulent conveyance and piercing the corporate veil); *In re Niedbalski*, 2023 WL 5016458, at *8 (allowing Section 1782 applicant to take discovery from nine banks and CHIPS to gather evidence for use in Canadian proceedings alleging fraud and related torts); *In re Abraaj Inv. Mgmt. Ltd.*, 2023 WL 2674752, at *6 (S.D.N.Y. Mar. 29, 2023) (granting Section 1782 applications aimed at 18 banks to gather information for use in fraudulent transfer proceedings in the Cayman Islands; finding that the subpoenas were not unduly burdensome or intrusive because "the materials

43

Applicants seek through the subpoenas are routinely produced by banks to satisfy discovery requests").

The district court's finding that the fourth *Intel* factor weighs against Saul's Application is therefore clearly erroneous and must be reversed.

### E. Saul's Application Satisfied the Statutory Requirements of Section 1782.

In addition to the four discretionary factors discussed above, a Section 1782 applicant must satisfy three statutory requirements: (i) the person from whom discovery is sought must reside or be found within the district; (ii) the discovery must be for use in a proceeding before a foreign or international tribunal; and (iii) the application must be made by an interested person. 28 U.S.C. § 1782(a). Saul's Application meets each of these three requirements.

*First*, as found by the district court and admitted by the movants, CHIPS, the Federal Reserve, and the eight remaining financial institutions are found in the Southern District of New York.[5] SPA 13.)

*Second*, the discovery sought in the Section 1782 Application is "for use" in the Probate Proceeding, the Accounting Proceeding, the Criminal

---

[5] As discussed above, Saul does not appeal the district court's finding that four entities are not "found in" the Southern District of New York: Itaú S.A. New York Branch; Itaú Securities; Itaú CorpBanca; and Banco Santander S.A. New York. *See supra* at 27 & n.4.

44

Proceeding, and the Contemplated Proceeding to invalidate the MOU. (A 43–44; A 46; A 682; A 1075.) A Section 1782 applicant need only show that the materials sought will be employed with some advantage or serve some use in the proceeding; the ""for use" requirement does not mean that the evidence must be admissible in foreign tribunal." *In re Chevron Corp.*, 633 F.3d 153, 163 (3d Cir. 2011) ("as the Court made clear in *Intel*, there is no requirement that the material be discoverable in the foreign country for it to be discoverable pursuant to section 1782 in the United States."); *see Brandi-Dohrn*, 673 F.3d at 82; *Accent Delight*, 869 F.3d at 131. Here, Saul has demonstrated that the discovery sought in his Section 1782 Application is critical to Saul's ability to show that Michael intentionally concealed assets that should have been added to Saul's inheritance and that Michael embezzled hundreds of millions of dollars that belonged to his father's estate. (A 43–44; A 95; ¶ 88; A 299 ¶¶ 37–41; A 678; A 947.)

*Third*, Saul is an "interested party" in the Probate Proceeding and the Accounting Proceeding because he is a party to both of them; he is an "interested party" in the Criminal Proceeding because he can participate in it; and he is an "interested party" in the Contemplated Proceeding to annul the MOU because he will be a party to it. *See Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the interested persons who

may invoke [Section] 1782." (internal quotations omitted). Thus, the third statutory requirement is plainly satisfied. (SPA 11.)

## CONCLUSION

For the foregoing reasons, Saul respectfully requests that the Court vacate the district court's December 21, 2023, order granting the motions to quash, and remand the case with directions to allow Saul to proceed with his subpoenas.

Respectfully submitted,

GABRIELA M.B. SCANLON
MB Scanlon PLLC
4301 50th Street NW
Washington, DC 20016
Tel. (215) 459-1171

46

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 10,515 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Calisto 14-point font.

**Dated:  April 5, 2024**

s/Gabriela MB Scanlon

_____

GABRIELA M.B. SCANLON
MB Scanlon PLLC
4301 50th Street NW
Washington, DC 20016
Tel. (215) 459-1171

# SPECIAL APPENDIX

# SPECIAL APPENDIX
## TABLE OF CONTENTS

**Page**

Order, dated December 21, 2023, Appealed From............ SPA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*IN RE EX PARTE APPLICATION OF SAUL KLEIN*

23 Misc. 211 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

"Happy families are all alike; every unhappy family is unhappy in its own way."[1]  And then there are the families whose discord and recriminations are such as to spawn legal action spanning international boundaries.

This case involves an application under 28 U.S.C. § 1782 for foreign discovery regarding alleged mismanagement of the estate of family patriarch Samuel Klein,[2] a Brazilian domiciliary. Ongoing probate proceedings in Brazil pit Samuel's children against one another.  The petitioner here, Saul Klein, alleges that his brother, Michael Klein, as administrator of their father's probate proceeding and executor of their father's estate, deceived him as to the value of their father's offshore assets in order to "deprive[] [him] of his rightful inheritance." Dkt. 2 at 2.  Saul here seeks records from U.S. financial institutions of transactions made on his father's behalf, and transactions by his siblings, Michael and Eva Klein.  Saul proposes to use these records in the probate proceeding in Brazil, and in civil and criminal lawsuits against Michael in Brazil.

---

[1] LEO TOLSTOY, ANNA KARENINA 1 (Constance Garnett trans., Modern Library 1996) (1878).

[2] For ease of reference, the Court will refer to members of the Klein family by their first names.

The Court initially granted, as facially supported, Saul's *ex parte* application under

§ 1782 for authority to issue subpoenas *duces tecum* to the U.S. institutions.  Dkt. 6.  Now before

the Court are two motions to quash those subpoenas.  One is from Michael and entities he and

Eva own and control (together, "the first movants").  Dkt. 29.  The second is from entities owned

and controlled by Michael's children, Raphael and Natalie Klein (together, "the second

movants").  Dkt. 37.  For the reasons that follow, the Court grants both motions and quashes the

subpoenas.

## I.    Background[3]

### A.    Facts

#### 1.    The Death of Samuel Klein

Born in Zaklików, Poland in 1923, Samuel witnessed firsthand the ravages of World War

II.  His mother and five of his nine siblings died in Treblinka.  Reina Decl. ¶ 12.  He was sent to

a forced labor camp; in 1944, while being transported to Auschwitz, he managed to escape.  *Id.*

¶ 12; *see also* Lawrence Bush, *Samuel Klein's Casas Bahia Empire*, JEWISH CURRENTS (Nov. 15,

2016), https://jewishcurrents.org/samuel-kleins-casas-bahia-empire.  In 1952, after years in

---

[3] The facts which form the basis of this decision are taken from the parties' pleadings and their submissions in support of and in opposition to the instant motion—specifically, Saul's petition, Dkt. 2 ("Pet."), and the attached declarations of Kátia Vilhena Reina, Dkt. 4 ("Reina Decl."), and Luiza A. Vasconcellos Oliver, Dkt. 5 ("Oliver First Decl."); the first movants' brief, Dkt. 30 ("First Movants' Br."), and the attached declaration of Carlos Portugal Gouvêa, Dkt. 31, Ex. 1 ("Gouvêa Decl."); Saul's brief in response to the first movants, Dkt. 33 ("Saul's First Br."), and the attached declarations of Luiza A. Vasconcellos Oliver, Dkt. 35 ("Oliver Second Decl."), and Mitch Jacobs, Dkt. 36 ("Jacobs Decl."); the second movants' brief, Dkt. 38 ("Second Movants' Br."), and the attached declarations of Lucas V. M. Bento, Dkt. 40 ("Bento Decl."), Flávio Luis Yarshell, Dkt. 41 ("Yarshell Decl."), and Pierpaolo Cruz Bottini, Dkt. 42 ("Bottini Decl."); Saul's brief in response to the second movants, Dkt. 45 ("Saul's Second Br."), and the attached declarations of Francisco Rezek, Dkt. 46 ("Rezek Decl."), and Alberto Zacharias Toron, Dkt. 47 ("Toron Decl."); and the second movants' reply brief, Dkt. 48 ("Second Movants' Reply Br."), and the attached declarations of Eduardo Secchi Munhoz, Dkt. 49 ("Munhoz Decl."), and Aldo Romani Netto, Dkt. 50 ("Netto Decl.").

European refugee camps, he emigrated to Brazil, where he traveled door-to-door selling sheets, tablecloths, and towels from a pushcart. Reina Decl. ¶¶ 13–14. Years of saving led to the purchase in 1958 of a small retail store ("Casa Bahia") in an industrial suburb on the outskirts of São Paulo. *Id.* From one store came hundreds more. By the early 2000s, Casa Bahia had become Brazil's largest retail chain, with tens of thousands of employees nationwide. *Id.* ¶¶ 15–17. And Samuel had become one of Brazil's wealthiest men, with a net worth exceeding several billion Brazilian reais (then approximately $1.5 billion USD). *Id.* ¶¶ 17, 21. He also kept dark secrets. He has been accused of assaulting dozens of underage girls throughout his tenure at Casa Bahia: civil lawsuits remain pending against his estate; others have settled for undisclosed sums. *See generally* Ciro Barros et al., *As Acusações Não Reveladas de Crimes Sexuais de Samuel Klein Fundador da Casa Bahia* [*The Undisclosed Accusations of Sexual Crimes of Samuel Klein, Founder of Casa Bahia*], AGÊNCIA PÚBLICA (Apr. 15, 2021, 6:00 A.M.), https://apublica.org/2021/04/as-acusacoes-nao-reveladas-de-crimes-sexuais-de-samuel-klein-fundador-da-casas-bahia/.

In November 2014, at age 91, Samuel died. Reina Decl. ¶ 25. He was survived by his three children (in birth order, Michael, Saul, and Eva) and several grandchildren (including Michael's children, Natalie and Raphael). *Id* ¶¶ 25, 38–39. At the time of his death, Samuel used a complex web of foreign holding companies (including Altara RK, Altara NK, Bahia RK, and Bahia NK, all incorporated in the Cayman Islands) to manage his ownership interest in Casa Bahia. At one point, both Saul and Michael worked for Casa Bahia; by the time Samuel died, Saul had left Casa Bahia, and Michael was in charge. *See id.* ¶¶ 19–24.

    **2.**    **The Initial Brazilian Proceedings**

In January 2015, Michael filed a probate proceeding in a local Brazilian court to distribute Samuel's estate. *See id.* ¶ 9; *see also id.*, Ex. 3 at 1–10 (translation of initial petition in Brazilian probate court). Michael was appointed administrator of the proceeding and executor of the estate, requiring him to "represent" and "manage" his father's estate, "protecting its assets with the same care as if they were his or her own." Art. 618, Código de Processo Civil ("Code of Civil Procedure"); *see also* Reina Decl. ¶ 40; Yarshell Decl. ¶ 19 n.4; Rezek Decl. ¶ 17.

The initial proceedings focused on Samuel's last will and testament, dated August 14, 2013. Under Brazilian law, half of Samuel's estate (the "forced portion") was required to pass in equal shares to his "necessary heirs" (his three children). His will allocated the remainder (the "disposable portion") as follows: 50% to Michael; 25% to Altara RK (to benefit Michael's son, Raphael); and 25% to Altara NK (to benefit Michael's daughter, Natalie). Reina Decl., Ex. 3 at at 26–30 (Samuel's will); *see also* Oliver Decl. ¶ 20; Yarshell Decl. ¶ 29. These heirs (Michael, Altara RK, and Altara NK) are Samuel's "testamentary heirs."

In March 2015, Samuel's heirs (necessary and testamentary) reached an amicable resolution to distribute his estate, which was valued at $499 million Brazilian reis (approximately $150 million USD). Under the heirs' memorandum of understanding ("MOU"), Saul was to receive (approximately) 60% of Samuel's total assets, Eva was to receive 17%, Michael was to receive 14%, and Michael's children were each to receive 4%. Reina Decl., Ex. 4 ("MOU") § 2.3. The MOU purported to "bind[] all the parties and their successors under any circumstances," "represent the full will of the parties in relation to [Samuel's] estate," and be "conditional only on judicial approval and the issue of the competent deed of distribution." *Id.* § 5.11–.13. The MOU also included a forum-selection clause. It stated that the parties "elect the

jurisdiction of the Judicial District of São Caetano do Sul, waiving any other, as privileged as it may be, to resolve any issues that may arise from" the MOU.  *Id.* § 7.1.

In December 2015, before the probate court could ratify the MOU, another individual, Moacyr Agustinho Jr., came forward to claim that Samuel was his father.  Reina Decl. ¶ 54–55; Gouvêa Decl. ¶ 16.  He filed a petition to share in the distribution of Samuel's estate as a necessary heir (thus diluting the others' forced share).  Gouvêa Decl. ¶ 18; Munhoz Decl. ¶ 23. To date, the probate proceeding remains pending and Moacyr's claims are unresolved.

### 3.    Subsequent Proceedings

Although the parties' briefs offer little detail on the point, it appears that the relationship between Samuel's children deteriorated soon after they signed the MOU.  In this litigation, Saul alleges, *inter alia*, that Michael has hidden their father's assets abroad, and distributed many of those assets to himself, his sister, and his children, perhaps explaining Michael's and Eva's willingness to assent to an MOU that allocated a far greater share of identified estate assets to Saul than that to which he would have been entitled under Brazilian law and Samuel's will.

Saul's application in this proceeding for discovery from U.S. banks derives from his claims of financial machinations and implicates several ongoing foreign proceedings.  These are as follows.

#### a.    *Saul's accusations*

The gravamen of Saul's accusations against Michael arises from the precipitous decline in Samuel's reported wealth in the years leading up to his death.  In 2009, his wealth was valued at more than $2 billion Brazilian reis, but in 2014, at the time of his death, less than $500 million Brazilian reis.  Reina Decl. ¶¶ 21, 38, 46.  Saul here focuses on several changes in Samuel's finances.

First, Saul alleges that Michael "forged Samuel's signature" to amend Casa Bahia's articles of incorporation in 2013, and to supersede a 2009 will. *E.g.*, Saul's First Br. at 2. These steps diluted Samuel's equity; increased Michael's share; and assigned millions of shares to foreign holding companies, including the Altara movants. The 2009 will (unlike the 2013 will) had divided Samuel's estate equally among his three children. Saul has propounded two expert reports that, he contends, "confirm[] Michael forged Samuel's signature." *See id.*, Ex. 1 (report of Sebastião Cinelli); *id.*, Ex. 10 (report of Celso Del Picchia).

Second, Saul alleges that Michael and his children, and Eva, "acquired almost $500 million in real estate" in the United States between 2012 and 2015, $310 million of which was purchased between October 2014 (just before Samuel's death) and March 2015 (when the MOU was signed). Saul's First Br. at 4. This real estate, he states, "substantially exceeds the amount accounted for as part of Samuel's estate." *Id.* Saul asserts that he was "never informed" about these acquisitions. *Id.* at 16. He urges the inference that the funds used to make these purchases were Samuel's—and that the properties purchased should be considered part of Samuel's estate.

    *b.*   *The probate, accounting, and contemplated proceedings*

The probate proceeding, the accounting proceeding, and the contemplated proceedings are properly considered together. The accounting proceeding began on May 11, 2020, pursuant to a probate court order; its purpose was to require Michael, as administrator of Samuel's estate, to provide information as to his management of the estate (and its assets) since Samuel's death. Reina Decl. ¶¶ 58–64. The probate and accounting proceedings remain pending.

Saul seeks through these proceedings to invalidate the MOU, which he claims failed to reflect the true value of his father's assets, and to establish a new division of his father's estate. He plans to pursue such relief through a petition in the probate proceeding (to oppose the MOU's

ratification), through the accounting proceeding (to prove Michael concealed foreign assets), and

through an original action (to annul the MOU as the product of fraud).

The parties disagree as to whether Saul can pursue relief through these proceedings. The

movants focus on Saul's several prior petitions (the most recent, in 2022) to ratify the MOU.

They note that he has been permitted to withdraw at least some funds pursuant to its terms—

which gave him a share far exceeding his entitlement under Samuel's will. *E.g.*, Gouvêa Decl.

¶¶ 22, 24. The movants argue that Brazil's bar on "contradictory behavior" forbids Saul from

now attempting to invalidate the MOU. *E.g.*, Yarshell Decl. ¶¶ 47–48. They separately argue

that the statute of limitations has run on any such claim. *E.g.*, Munhoz Decl. ¶¶ 25–32.

> b.    *The criminal investigation*

The criminal investigation commenced on June 6, 2023, after a complaint filed by Saul

with the 78th Police District of São Paulo (the "Criminal Authority"). Reina Decl. ¶¶ 76–78;

Oliver First Decl., Ex. 2 at 77–88 (translation of complaint). Since then, the Criminal Authority

has found probable cause that Michael had committed "the crime of theft by deception." Oliver

First Decl. ¶¶ 39–40. The investigation remains ongoing.

> c.    *The discovery proceedings*

Saul has initiated three preliminary discovery proceedings in Brazilian courts (an "*ação

de produção antecipada de provas*" or "action for pretrial production of evidence"). Each was

filed in April 2023. One is pending; the other two were dismissed on procedural grounds (that

the requested evidence "could be obtained in the course of [a future] lawsuit"), which Saul has

challenged in pending appeals. *See* Yarshell Decl. ¶¶ 54–58.

### 4.   The Present Petition

In this action, Saul seeks discovery from 12 U.S. financial institutions: Citibank, N.A.;

Banco Santander S.A. New York; Santander Investment Securities Inc. of New York; JPMorgan

Chase Bank, N.A.; J.P. Morgan Securities LLC; Credit Suisse (USA), Inc.; Safra National Bank

of New York; Banco Itaú S.A. New York Branch; Itaú CorpBanca; Itaú Securities; the Clearing

House Payments Company LLC; and the Federal Reserve Bank of New York.

Saul's sample subpoena demands "[a]ll Documents and Communications relating to any

payment, transaction, transfer, conveyance, wire, debit, credit, payment messages and/or

payment orders to, from, for the benefit of, on behalf of, or at the request of" Samuel, Michael,

and Eva, between January 1, 2013 to the present.  Pet., Ex. 2 ("Exhibit Subpoena") at 12.  It lists

"Target Entities," including the Altara and Bahia entities, and demands records of "all

transactions, withdrawals, deposits, transfers of money or any activity in a bank account

(checking, savings, and/or investment account) owned" by any such entity.  *Id.* at 13.

### B.   Procedural History

On June 28, 2023, Saul filed the instant petition, Dkt. 1, along with a memorandum of

law in support, Dkt. 2 ("Pet.").  On July 10, 2023, the Court granted his application.  Dkt. 6.

On July 24, 2023, Michael and entities he and Eva own and control (together, "the first

movants") filed an unopposed motion to intervene, Dkt. 8, which the Court granted, Dkt. 10.  On

August 2, 2023, the first movants moved to stay the subpoenas to permit them a "reasonable

opportunity to investigate [Saul's] allegations" and "seek appropriate relief."  Dkt. 19.  On

August 7, 2023, the Court stayed compliance with the subpoenas, and directed the first movants

and Saul to brief the merits of the subpoenas on an expedited schedule.  Dkt. 27.

On August 11, 2023, entities owned and controlled by Michael's children, Raphael and Natalie (together, "the second movants"), filed a motion to quash the subpoenas. Dkt. 28. The Court, consistent with the briefing schedule set for the first movants, set an expedited schedule for the second movants' briefs on the subpoenas' merits. Dkt. 32.

Also on August 11, 2023, the first movants filed their motion to quash, Dkt. 29, and submitted a memorandum of law in support, Dkt. 30 ("First Movants' Br."). On August 15, 2023, Saul filed a memorandum of law in opposition to the first movants' motion. Dkt. 33 ("Saul's First Br."). On August 21, 2023, the second movants filed their motion to quash, Dkt. 37, and submitted a memorandum of law in support, Dkt. 38 ("Second Movants' Br."). On August 28, 2023, Saul filed a memorandum of law in opposition to the second movants' motion. Dkt. 45 ("Saul's Second Br."). On September 1, 2023, the second movants filed a reply. Dkt. 48 ("Second Movants' Reply Br.").

On October 31, 2023, the Court heard argument on both motions. Dkt. 62 ("Tr."). On November 1, 2023, Saul filed a supplemental letter addressing concerns raised by the Court in argument. Dkt. 61 ("Saul Supp. Br."). On November 2, 2023, the second movants filed a reply. Dkt. 62 ("Second Movants' Supp. Br.").

## II.    Legal Standards

Section 1782 authorizes district courts to order discovery from third parties in the United States for use in foreign proceedings. In relevant part, it provides as follows:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person . . . . To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and

9

the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).  The statute thus imposes three prerequisites to the issuance of a foreign discovery order.  *See, e.g.*, *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 192 (S.D.N.Y. 2006). First, the target must "reside" or be "found" in this District.  Second, the evidence sought must be "for use" in a foreign proceeding.  Third, the application must be made by a foreign tribunal or "any interested person."

Once those prerequisites have been satisfied, a district court has "broad discretion over the issuance of discovery orders pursuant to § 1782."  *In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002).  In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the Supreme Court set out four factors to guide district courts in exercising this discretion:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which event "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad";
>
> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court assistance";
>
> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and
>
> (4) whether the request is "unduly intrusive or burdensome."

*In re del Valle Ruiz*, 939 F.3d 520, 533–34 (2d Cir. 2019) (quoting *Intel*, 542 U.S. at 264–65). These "factors are not to be applied mechanically," and a district court "should also take into account any other pertinent issues arising from the facts of the particular dispute."  *Kiobel ex rel. Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018).  A district court's discretion should also be exercised in light of the statute's "twin aims" of "providing

efficient means of assistance to participants in international litigation in our federal courts and

encouraging foreign countries by example to provide similar means of assistance to our courts."

*Id.* at 244 (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)).

### III.    Discussion

Both groups of movants argue that Saul's application fails one or more of Section 1782's

statutory requirements and that the Court should exercise its discretion, under *Intel*, to deny the

application.  The Court need not definitively resolve whether the statutory factors are met

because the *Intel* factors clearly require quashing the subpoenas.  But certain subpoenas are also

clearly unable to—or would struggle to—satisfy a statutory factor.  For completeness, the Court

addresses the statutory requirements before discussing the *Intel* factors.

#### A.    Statutory Requirements

Section 1782 requires an applicant to meet these requirements: (1) the entity from whom

discovery is sought must reside or be found in the district in which the application was made; (2)

the discovery must be "for use in a foreign proceeding before a foreign tribunal"; and (3) the

applicant must be either a foreign tribunal or an "interested person." *Certain Funds, Accounts

and/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 117 (2d Cir. 2015) (internal quotation

marks omitted).  It is undisputed that Saul is an "interested person" in the relevant proceedings;

the third factor is thus satisfied. *Cf. Intel*, 542 U.S. at 254 ("litigants are . . . the most common

example of the 'interested person[s]' who may invoke § 1782" (alteration in original)).  The first

two factors, however, are disputed.

#### 1.    "Resides or Is Found"

Only "[t]he district court of the district in which a person resides or is found" may require

him to produce evidence for a foreign proceeding.  28 U.S.C. § 1782(a).  The Second Circuit has

interpreted Section 1782's "resides or is found" requirement to extend to "the limits of personal

jurisdiction consistent with due process." *In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019).

Thus, a person "resides or is found" in this District if he is subject to personal jurisdiction here.

Both groups of movants argue that four of the 12 subpoenaed entities are not subject to

jurisdiction in this District: Itaú S.A. New York Branch ("Itaú NY"); Itaú Securities; Itaú

CorpBanca; Banco Santander S.A. New York ("Santander"). First Movants' Br. at 12–13;

Second Movants' Br. at 14–16. Saul disagrees. Saul's First Br. at 6.

The movants are correct. The Court considers the four entities in turn.

As to the Itaú entities, Saul acknowledges that he "misnamed" Itaú NY; as to Itaú

Securities and Itaú CorpBanca, his brief proposes alternative names: respectively, "Itaú USA

Securities Inc." and "Banco Itaú Chile New York Branch." Saul's First Br. at 6. These "full

names" (as Saul puts it) differ markedly from those in his application. Saul nonetheless argues

that the Court should treat these as the entities he *intended* to subpoena. Saul's First Br. at 6 &

n.12. That bid does not save the three Itaú subpoenas at issue. Saul does not dispute that the

entities he listed in his application do not exist (Itaú NY) or fall outside the Court's jurisdiction

(Itaú Securities and Itaú CorpBanca). Second Movants' Br. at 15–16 & 15 n.25. Although Saul

would have to address the other deficiencies identified here, he is at liberty to file a new § 1782

application addressed to new respondents; if so, those entities can appear and dispute jurisdiction

over them. But Saul may not amend this application to add new parties via a brief opposing a

motion to quash. *See, e.g., In re SPS I Fundo de Investimento de Acoes-Investimento no

Exterior*, No. 22 Misc. 118 (LAK), 2022 WL 17553067, at *4 (S.D.N.Y. Dec. 9, 2022) (granting

partial motion to quash under similar circumstances: "the Court cannot have personal jurisdiction

over a corporate ghost"). The Court thus quashes the three Itaú subpoenas.

As to Santander, Saul subpoenaed Banco Santander S.A., which has a branch in New York. But the entity itself is incorporated and headquartered in Spain. *See Second Movants' Br.* at 15 n.25. The Court thus lacks general jurisdiction over its activities. *See, e.g., Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). And Saul has not presented facts supporting the exercise of specific jurisdiction. *Cf., e.g., In re del Valle Ruiz*, 939 F.3d at 530 (specific jurisdiction established where "discovery material sought proximately resulted from the [subpoenaed firm's] forum contacts"). The Court thus quashes the BSNY subpoena.

The remaining eight subpoenaed entities are each incorporated in or have their principal place of business in this District. Those are: Citibank, N.A.; Santander Investment Securities Inc. of New York; JPMorgan Chase Bank, N.A.; J.P. Morgan Securities LLC; Credit Suisse (USA), Inc.; Safra National Bank of New York; the Clearing House Payments Company, LLC; and the Federal Reserve Bank of New York. It is undisputed that the Court has general jurisdiction over these entities.

### 2. "For Use in a Proceeding in a Foreign . . . Tribunal"

The evidence sought under a Section 1782 order must be "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). "[T]he requirements of § 1782 are not satisfied by the requesting party reciting some minimal relation to [the] pending foreign proceeding." *In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d 701, 706 (S.D.N.Y. 2015). Rather, evidence is only "for use" in such a proceeding if it can "be employed with some advantage or serve some use in [that] proceeding." *Mees*, 793 F.3d at 298. As such, an inquiry into "[t]he relevance of the information sought may be necessary" to the analysis, "insofar as it is difficult to conceive how information that is plainly irrelevant to the foreign proceeding could be said to be 'for use' in that proceeding." *KPMG*, 798 F.3d at 120 n.7. "Put differently, discovery is 'for

13

use' in a foreign proceeding if it is relevant to the subject matter of the proceeding, and the evidence would 'increase the applicant's chances of success' in the proceeding." *In re Asia Maritime Pacific Ltd.*, No. 15 Civ. 2760 (VEC), 2015 WL 5037129, at *3 (S.D.N.Y. Aug. 26, 2015) (quoting *Mees*, 793 F.3d at 291).

Whether Saul has satisfied the "for use" requirement presents difficult questions. The Court considers the issues raised by the distinct uses, in civil and criminal proceedings, to which he proposes to put the evidence he seeks.

      *a.    Civil proceedings*

Saul proposes to use the financial records he seeks to "annul" the agreed-upon distribution of Samuel's estate in civil probate proceedings, pending and contemplated. Pet. at 3; *see also id.* at 28–30. Movants argue, however, that any such effort is by now time-barred.

The parties' experts agree that Brazil's Code of Civil Procedure allows a decedent's heirs to reach an agreement dividing up the estate's assets (known as an "amicable partition") and thus foreclose future probate proceedings. Rezek Decl. ¶ 26; Munhoz Decl. ¶¶ 17–18. They agree, too, that Samuel's children did so in this case, Rezek Decl. ¶ 27; Munhoz Decl. ¶¶ 12, 21, 23, by agreeing in 2015 to an "irrevocable and irreversible" distribution of Samuel's estate, MOU § 5.11. They also agree that an heir, like Saul, who seeks to annul an amicable partition must do so within one year. Rezek Decl. ¶ 35; Munhoz Decl. ¶¶ 25, 27.

The experts disagree, however, as to when the statute of limitations begins to run. Saul's expert, José Francisco Rezek, former Justice of the Brazilian Supreme Court, argues that the limitations period commences "from the date of the final judgment" ratifying the amicable partition. Rezek Decl. ¶ 35. Because there has not been a final judgment in the probate proceedings (due to the dispute over Moacyr's paternity), Rezek argues that the limitations

period has yet to begin to run. *Id.* ¶ 41. In contrast, the second movants' expert, Professor

Eduardo Secchi Munhoz, argues that the limitations period commences "from the date the 2015

MOU was signed," Munhoz Decl. ¶ 27, such that Saul's window to move to annul the amicable

partition closed in 2016, *id.* ¶ 32.

Although the Court need not definitively resolve this issue given its finding that the *Intel*

factors require quashing the subpoenas, Munhoz's position is considerably more persuasive than

Rezek's. Munhoz alone translated the full relevant text at issue (Article 657 of the Code of Civil

Procedure) for this Court. Rezek quotes the introductory text of Article 657, but omits its "sole"

paragraph, which sets out the limitations period. Rezek Decl. ¶ 33. In full, Article 657 reads:

> *Art. 657.* An amicable partition by a public instrument, a term in the records of the
> probate proceeding, or a private writing approved by the judge, may be annulled
> due to fraud, coercion, essential error or the intervention of an incompetent party,
> pursuant to § 4 art. 966.

> *Sole paragraph.* The right to annul an amicable partition shall expire in one (1)
> year, counted from the date of the partition:
> (i) in the case of duress, from the day of its cessation;
> (ii) in case of error or willful misconduct, from the date of the act;
> (iii) in the case of incapacity, from the day on which such incapacity ceases.

Munhoz Decl. ¶ 28.[4] Saul surely asserts "willful misconduct": he alleges that Michael

"deceived" him into "accepting the terms" of the MOU, having "failed to report . . . the entirety

of [Samuel's] assets," significant portions of which he had taken for himself. Pet. at 2; *see also*

*id.* at 24. Given that "the one-year statute of limitations established by law beg[ins] to run from

---

[4] Under Federal Rule of Civil Procedure 44.1, the Court may "consider any relevant material or
source . . . whether or not submitted by a party." FED. R. CIV. P. 44.1. A published translation of
Brazil's Code of Civil Procedure accords with Munhoz's translation of the relevant provision.
*See* BRAZILIAN CODE OF CIVIL PROCEDURE art. 657, sole paragraph, at p. 265 (Alexandra Barros
trans., Editora Juspodivm pub. 2017) ("The right to annul an amicable distribution expires within
one (1) year of: (i) the day on which it ceased, in the case of coercion; (ii) the day on which it
was committed, in the case of mistake or fraud; (iii) the day on which the incapacity ceased, in
the case of an incompetent party.").

the date on which [a defrauded heir] agreed to the partition proposal," Munhoz Decl. ¶ 30

(quoting Appeal No. 1,002,174, T.J.S.P. [10th Civil Law Panel], decided July 30, 2021), any

attempt by Saul to annul the MOU, signed in 2015, would be time-barred.  The cases Rezek cites

to support the contrary position either predate the relevant (2015) amendments to the Code of

Civil Procedure, or involve a judicial (*i.e.*, not an amicable) partition, to which Article 657 does

not apply.  *Compare* Rezek Decl. ¶¶ 35–36, *with* Munhoz Decl. ¶¶ 30–31.

Given the presence of a decisive alternative basis for denying Saul's application, and that

this issue implicates an unfamiliar question of foreign law, the Court declines to rule on this

ground.  *See Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995) (federal

court "should only consider authoritative proof" that a foreign tribunal's rules of evidence would

deem requested materials inadmissible).  *But see KPMG*, 798 F.3d at 122 n.11 (*Euromepa* should

not be applied to relieve "the burden [placed] on a § 1782 applicant to establish that [he] will

have some means of actually using the evidence [he seeks] in the foreign proceeding").  Had this

issue been dispositive, it would have presented a substantial hurdle to the application.

### b.    *Criminal proceedings*

Saul separately proposes to use the evidence he seeks in a pending police investigation.

In June 2023, Saul filed a complaint with the 78th Police District of São Paulo (the "Criminal

Authority"), alleging Michael had forged Samuel's signature to embezzle personal and corporate

funds.  Reina Decl. ¶¶ 76–78; Oliver First Decl., Ex. 2 at 77–88 (translation of complaint).  That

same month, the Criminal Authority found probable cause that Michael had committed "the

crime of theft by deception."  Oliver First Decl. ¶¶ 39–40.  The investigation is ongoing.

The Second Circuit has defined the term "for use" in a manner casting doubt on whether Saul's intended use qualifies.[5] Its decision in *Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.*, 798 F.3d 113 (2d Cir. 2015) is instructive. In *KPMG*, investors in failed foreign instruments sought documents from American accounting firms relating to the instruments' default; the investors planned to use the evidence in ongoing liquidation proceedings in the Cayman Islands and Bahrain. *See id.* at 115–17. Judge Lynch, writing for a unanimous panel, held that the investors had "failed to show any way that they could put before the foreign tribunals the information they sought to discover." *Id.* at 122. The investors' sole role would be to "furnish information" to the liquidators "*in the hope* that it might be used" in their eventual report. *Id.* at 121 (emphasis in original). As Judge Lynch explained:

> That is no different from a third party providing information to a private litigant that it believes might be useful in a lawsuit, or a witness approaching a prosecutor's office claiming to have knowledge of a crime. Such information might be relevant or interesting to the recipient, but it is not "for use" in any proceeding in which the *recipient* is a party unless the recipient takes some further, independent action to introduce it.

*Id.* (emphasis in original).

On the record here, the most Saul appears able to do is to forward the evidence he obtains to the Criminal Authority, which, exercising its discretion, will decide whether to initiate a

---

[5] The Court assumes *arguendo* that the Criminal Authority's investigation is a "proceeding" before a foreign "tribunal," as Section 1782 requires. The second movants' argument to the contrary is based on case law predating the 1996 amendment to § 1782, *see* Second Movants Br. at 13–14, which clarified that "criminal investigations conducted before formal accusation" qualify as proceedings under the statute, *Intel*, 542 U.S. at 259. These precedents appear to have been overtaken by the amended statute and by *Intel* itself. *Compare, e.g., General Universal Trading Corp. v. Morgan Guaranty Tr. Co. of N.Y.*, 936 F.2d 702, 705 (2d Cir. 1991) (contrasting "adjudicative proceeding[s]," which qualify for assistance, and "law enforcement investigation[s]," which do not), *with, e.g., Intel*, 542 U.S. at 259–30 (courts may "grant assistance when proceedings are pending before investigating magistrates"), *and Optimal Inv. Servs., S.A. v. Berlamont*, 773 F.3d 456, 461–62 (2d Cir. 2014) (affirming § 1782 order for evidence for use by Swiss investigating magistrate).

formal criminal prosecution. Dkt. 31, Ex. 1 ("Gouvêa Decl.") ¶¶ 111–13; Dkt. 50 ("Romani

Decl.") ¶¶ 20–24. Unlike the petitioners in *In re Accent Delight International Ltd.*, 869 F.3d 121

(2d Cir. 2017), who "retain[ed] the procedural right," as civil parties to the investigation, to place

the requested documents before a foreign magistrate, *id.* at 126 n.4, 132, Saul has not pointed to

a "discernible procedural mechanism" for "injecting the evidence [he seeks] into the [relevant]

proceeding," *KPMG*, 798 F.3d at 121, 122 n.11, or a privilege under Brazilian law to do so.

Indeed, the declarations submitted here indicate that whether to consider such evidence is solely

"the prerogative of the police as the party conducting the procedure." Romani Decl. ¶ 17. This,

too, would present a substantial barrier to Saul's bid were it not otherwise foreclosed.[6]

   **B.**   ***Intel*'s Discretionary Factors**

   Even assuming that Saul has carried his burden "to establish that [he] will have some

means of actually using the evidence [he seeks] in the foreign proceeding," *KPMG*, 798 F.3d at

124 n.11, his application would still need to satisfy the discretionary *Intel* factors.

   A district court has "broad discretion over the issuance of discovery orders pursuant to

§ 1782," *In re Edelman*, 295 F.3d at 181, and "is not required to grant a § 1782(a) discovery

application simply because it has the authority to do so," *Intel*, 542 U.S. at 264; *see also In re

Grynberg*, 223 F. Supp. 3d 197, 202 (S.D.N.Y. 2017). In *Intel*, the Supreme Court articulated

four factors to guide district courts in exercising this discretion:

> (1) whether "the person from whom discovery is sought is a participant in the
> foreign proceeding," in which event "the need for § 1782(a) aid generally is not as
> apparent as it ordinarily is when evidence is sought from a nonparticipant in the
> matter arising abroad";

---

[6] Any argument that the evidence could be "for use" in a future criminal prosecution before a
Brazilian court would be equally problematic. As the Second Circuit has held, "discovery
material is not 'for use' in a foreign proceeding if it must first be used to persuade a third
party"—here, the Brazilian criminal authorities—"to initiate that proceeding." *IJK Palm LLC v.
Anholt Servs. USA, Inc.*, 33 F.4th 669, 678 (2d Cir. 2022).

(2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court assistance";

(3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

(4) whether the request is "unduly intrusive or burdensome."

*In re del Valle Ruiz*, 939 F.3d at 533–34 (quoting *Intel*, 542 U.S. at 264–65). Courts exercising this discretion must consider "the twin aims of the statute, namely, providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *KPMG*, 798 F.3d at 117 (cleaned up).

For the reasons below, the Court finds that the four factors are each either neutral or weigh against Saul's application. Viewing them holistically, the application must be denied.

### 1. Factor One: Jurisdictional Reach of the Brazilian Tribunal

Under the first factor, a court is to consider whether "the person from whom discovery is sought is a participant in the foreign proceeding." *Intel*, 542 U.S. at 264. "A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce the evidence." *Id.* In contrast, "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.*

As the Second Circuit has explained, a district court must focus on the "real party from whom documents are sought," rather than the nominal party to whom a subpoena is addressed. *Kiobel*, 895 F.3d at 245. "[T]he relevant inquiry is whether the foreign tribunal has the ability to control the evidence sought and order production, not whether the tribunal has control over the

party targeted by the Section 1782 application." *In re Porsche Automobil Holding SE*, No. 15 Misc. 417 (LAK), 2016 WL 702327, at *7 (S.D.N.Y. Feb. 18, 2016); *see also, e.g.*, *In re Microsoft Corp.*, 428 F. Supp. 2d at 194 (framing "[t]he relevant inquiry" as "whether the evidence is available to the foreign tribunal"). If a petitioner seeks the documents of his opponent, or her privies, "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. Courts thus look askance at applicants who "for all intents and purposes . . . seek[] discovery from . . . their opponent in the [foreign] litigation." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004).

Here, Saul has subpoenaed only *non-parties*. However, in substance, he seeks records of the *parties*: the bank records of Michael and his adversaries in the Brazilian probate proceedings. To the extent that the recipients of Saul's subpoenas (U.S. financial institutions) prove to have responsive materials—and as reviewed below, Saul has not mustered non-speculative evidence of this—such materials by definition will be financial records of the parties to the Brazilian civil proceedings (*e.g.*, their bank statements). The respondents do not have any independent records germane to the Brazilian courts. And Saul does not dispute that, to the extent the parties have accounts at the U.S. financial institutions he has subpoenaed, they, as account holders, have access to and could access them were such materials sought of them in a Brazilian proceeding. For § 1782 purposes, Saul's subpoena is thus unlike a subpoena to a non-party percipient witness, *see, e.g.*, *Optimal Inv. Servs., S.A. v. Berlamont*, 773 F.3d 456, 461–62 (2d Cir. 2014), or even a subpoena to a U.S.-based employee of a foreign party, *In re 000 Promneftstroy*, 134 F. Supp. 3d 789, 792 (S.D.N.Y. 2015). In substance, "the real party from whom documents are sought" are Saul's opponents (the heirs), all of whom are "involved in [the] foreign

proceedings." *Kiobel*, 895 F.3d at 245; *see also, e.g.*, *In re Elvis Presley Enters. LLC*, No. 15 Misc. 386 (DLC), 2016 WL 843380, at *3 (S.D.N.Y. Mar. 1, 2016) (first *Intel* factor weighed against § 1782 application when documents were sought from foreign opponent's "wholly-owned subsidiary"). "The first *Intel* factor [thus] counsels against granting" Saul's petition. *Kiobel*, 895 F.3d at 245.

To be sure, the Second Circuit's leading cases on this factor arose in the context of subpoenas to a party's *legal* counsel. *See Schmitz*, 376 F.3d at 85; *Kiobel*, 895 F.3d at 241. Such subpoenas implicate unique concerns about lawyer-client relations (and the need for candor and confidentiality) not presented by subpoenas to U.S. financial institutions. But similar logic applies. A ruling otherwise would undermine the first *Intel* factor. It would invite foreign parties to end-run directly seeking discovery from their adversaries in the foreign proceeding by serving § 1782 subpoenas on the adversaries' U.S.-based agents or archivists. Absent some justification for this expedient, the first *Intel* factor weighs against his application. The purpose of the first factor, after all, is to show appropriate deference to the foreign tribunal, which "can itself order [the parties] to produce evidence." *Intel*, 542 U.S. at 264.

On the record at hand, the first factor weighs against Saul's application.

## 2. Factor Two: Nature and Receptivity of the Brazilian Tribunal

The second factor examines "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Id.* at 264. The Second Circuit instructs that district courts "should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782," including, for example, "a forum country's

judicial, executive, or legislative declarations that specifically address the use of evidence gathered under foreign procedures." *Euromepa S.A.*, 51 F.3d at 1099–100.

The Court finds this factor neutral. As the second movants note, the one outstanding issue before the Brazilian probate court concerns Moacyr's claim of Samuel's paternity. The requested discovery will be at best peripheral, and at worst irrelevant, to such proceedings. *Cf., e.g.*, *In re King.com Ltd.*, No. 16 Misc. 80070 (JCS), 2016 WL 4364286, at *8 (N.D. Cal. Aug. 16, 2016) (second factor weighed against discovery where foreign tribunal had "suspended the submission of evidence" as to all issues). That said, as Saul argues, he also contemplates a proceeding to invalidate the MOU. In such a proceeding, evidence of his siblings' financial dealings, including to camouflage assets that should have been treated as belonging to the estate, may well be germane. Although Saul's argument is weakened by the fact that no such proceeding is underway, there is no indication that, were it to be initiated, a Brazilian court would categorically reject such evidence. Saul First Br. at 32–33; Dkt. 5 ("Oliver Decl.") ¶¶ 50-53; *see also In re Degens*, No. 20 Misc. 237 (JGK) (RWL), 2020 WL 4252725, at *4 (S.D.N.Y. July 24, 2020) ("no Brazilian rule, policy, or law prohibits or discourages" Brazilian courts from considering evidence acquired under Section 1782). The Court thus finds this factor neutral.

### 3. Factor Three: Attempt to Circumvent U.S. and Brazilian Laws or Policies

Under the third *Intel* factor, the Court may consider Saul's efforts in the Brazilian courts to procure the information he seeks here. Courts are loath to condone "blatant end-run[s] around 'foreign proof-gathering restrictions or other policies of a foreign country'" and have refused to grant § 1782 applications that would "preempt or contradict" decisions by foreign tribunals. *Microsoft Corp.*, 428 F. Supp. 2d at 195 (citing *Intel*, 542 U.S. at 264)). Of course, "§ 1782 contains no foreign-discoverability requirement." *Mees v. Buiter*, 793 F.3d 291, 303 (2d Cir.

2015). And "'proof-gathering restrictions' are best understood as rules akin to privileges

that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to*

*facilitate* investigation of claims by empowering parties to require their adversarial and non-party

witnesses to provide information." *Id.* at 303 n.20 (emphasis in original).

The third factor weighs against Saul's application, but only slightly. As the second

movants note, the MOU contains an exclusive jurisdiction clause. Second Movants Br. at 22.

Under it, Saul "elect[ed] the jurisdiction of the Judicial District of São Caetano do Sul, waiving

any other, as privileged as it may be, to resolve any issues that may arise from" the MOU. MOU

¶ 7.1. "Courts in this District have determined that the petitioner's decision to enter into a

forum-selection clause is a factor that can weigh against the granting of an application brought

under section 1782." *In re Alghanim*, No. 21 Misc. 167, 2022 WL 1423088, at *4 (S.D.N.Y.

May 5, 2022) (collecting cases); *see also Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633 F.3d 591,

595 (7th Cir. 2011) ("a forum-selection clause in a contract" counsels against § 1782 discovery

where the parties did not "contemplate the level of compulsory process available in America").

To allow Saul to pursue discovery in the United States would arguably allow him to sidestep the

exclusive forum that he agreed would arbitrate disputes among him and his siblings. That said,

the forum selection clause does not textually preclude use of vehicles like § 1782 to procure

discovery abroad. And the case law does not categorically hold such clauses to foreclose all

foreign discovery. *See generally* LUCAS V.M. BENTO, THE GLOBALIZATION OF DISCOVERY

§ 9.12, at 198–99 (2020). The MOU's exclusive-jurisdiction clause, though not preclusive, thus

weighs against Saul's application.[7]

---

[7] The Court rejects the second movants' separate argument that the Brazilian courts are "hostile" to Saul, "having dismissed his preliminary discovery proceedings and rejected his efforts to remove Michael as the administrator of Samuel's estate." Second Movants' Br. at 20–22. As

### 4.   Factor Four: Undue Intrusion or Burden

To "assess whether the discovery sought is overbroad or unduly burdensome," a court must "apply[] the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302. "[W]hether a request is intrusive or burdensome should not be assessed based on the 'discovery scope' available in the foreign proceeding." *Id.* Rule 26(b)(1) provides that the scope of discovery is limited to "relevant" material that is "proportional to the needs of the case . . . and whether the burden or expense of the proposed discovery outweighs its likely benefit," among other factors. *Elvis Presley Enters.*, 2016 WL 843380, at *5. "Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088 (RMB) (HBP), 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016).

This factor weighs heavily against Saul's application. Saul's subpoenas—seeking "[a]ll documents and communications" from 12 financial institutions[8] relating to 26 entities[9] covering

---

Saul has shown and as is undisputed, two of the three preliminary discovery proceedings "were rejected by a first level court without a decision on the merits," and are pending on appeal; the third remains pending. Rezek Decl. ¶ 21. And the second movants' expert admits that these proceedings failed because the evidence sought "could be obtained in the course of [a future] lawsuit" in Brazil. Yarshell Decl. ¶ 13.

[8] The financial institutions are: "Citibank, N.A.; Banco Santander S.A. New York; Santander Investment Securities Inc. of New York; JPMorgan Chase Bank, N.A.; J.P. Morgan Securities LLC; Credit Suisse (USA), Inc.; Safra National Bank of New York; Banco Itaú S.A. New York Branch; Itau CorpBanca; Itaú Securities; the Clearing House Payments Company LLC; and the Federal Reserve Bank of New York." Pet. at 6.

[9] As listed in Saul's exhibit subpoena, the entities are: "Altara RK Investments Limited; TWINS-CB Limited; EK-VV Limited; Bahia VV RK Limited; Bahia VV NK Limited; Altara NK Investments Limited; Haifa International Corporation; Kireland 83rd Street Chicago LLC; Kireland Belvidere Street Waukegan LLC; Kireland Commercial Ave Chicago LLC; Kireland Genesis Drive North Aurora, LLC; Kireland Kirby Plaza Houston LLC; Kireland LLC; Kireland Mainstreet Fairfax LLC; Kireland North Dearborn Street Chicago LLC; Kireland Peach Tree Road Atlanta LLC; Kireland South Elgin Illinois LLC; Kireland West Heimer Road Houston

an almost 11-year period—are extremely broad. *Optionality Consulting Pte. Ltd v. Edge Tech.*
*Grp. LLC*, 18 Civ. 5393 (ALC) (KHP), 2022 WL 1977746, at *4 (S.D.N.Y. Jun. 3, 2022)
(describing subpoena for "all documents and communications" over extended period as "wildly
overbroad" and "presumptively improper").

Counsel's papers in support of the § 1782 application had been notably silent on Saul's
basis for subpoenaing these 12 banks. At argument, when the Court probed Saul's counsel as to
the basis for pursuing subpoenas against the 12 financial institutions, counsel—startlingly—was
unable to identify a factual basis for seeking records from *any* of these entities. Counsel
ultimately could offer only that Saul "had [a] recollection [that] some of the institutions" were
ones "his father usually used to hold accounts with." Tr. 38. That statement would not support
the bulk of the § 1782 subpoenas, which seek records of accounts of others (*e.g.*, Michael, Eva,
and the Altara and Bahia entities). In all events, the Court invited counsel to fortify the
representation that Samuel had done business with some of the institutions, but counsel's post-
argument letter failed entirety to do so. Its sole relevant exhibit, Samuel's 2014 tax return, lists
transactions made through "Safra JS Adm. de Recursos S/A," "Banco Safra" and "Citibank
Fundos de Investimentos"—all of which appear to be *Brazilian* entities, and none of which are
subpoenaed here. Saul Supp. Br., Ex. 1 at 2–27. Indeed, as the second movants note, all of the
transactions reflected therein appear to have occurred within Brazil; there is no indication
whatsoever that U.S. financial institutions were even involved. Second Movants' Supp. Br. at 1.
In sum, to an exceptional degree, in the Court's experience, Saul's application presents as "an
archetypal fishing expedition." *In re MT Baltic Soul Produktentankschiff-Ahrtsgesellschaft mgH*

---

LLC; Kireland-B, LLC; Mikeone EK 801 West LLC; Mikeone EK 809 West LLC; Mikeone Ek
ATL Ops Center LLC; Mikeone EK Columbia SC LLC; Mikeone EK Linden LLC; Mikeone EK
Roanoke LLC; Mikeone M Street Holdings LLC." Exhibit Subpoena at 6.

*& Co. KG*, No. 15 Misc. 319 (LTS), 2015 WL 5824505, at *3 (S.D.N.Y. Oct. 6, 2015); *see also*

*Jiangsu S.S. Co. v. Success Superior Ltd.*, No. 14 Civ. 9997 (CM), 2015 WL 3439220, at *1, *5

(S.D.N.Y. Feb. 5, 2015). It could have been made to 12 randomly selected banks in this District

and would have had no less a factual foundation.

The wholly conjectural basis for Saul's § 1782 subpoenas is dispositive as to this factor.

Had Saul come forward with a concrete basis for the assumption that these 12 banks held

pertinent transaction records of Samuel, Michael, Eva, or associated persons—as opposed to

guessing that these 12 might—the subpoenas, at least in part, might have cleared the undue-

burden bar. The banks have not claimed a production burden. And the records sought are likely

not onerous to unearth: given the nature of such electronically stored materials, banks "should be

able to search for and produce the records of wire transfers without significant burden." *In re*

*Rodriguez Guillen*, 20 Misc. 102 (ALC), 2020 WL 3497002, at *3 (S.D.N.Y. June 29, 2020).

But, where "a subpoena sweepingly pursues material with little apparent or likely relevance to

the subject matter it runs the greater risk of being found overbroad and unreasonable," *United*

*States v. Int'l Bus. Machs. Corp.*, 83 F.R.D. 97, 106–07 (S.D.N.Y. 1979), even where, as here,

complying with the request has not been shown to be onerous, *see, e.g.*, *Kirschner v. Klemons*,

No. 99 Civ. 4828 (RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005).

Were a broad-ranging subpoena propounded to a bank in ordinary domestic civil

litigation with the proponent unable to articulate a non-speculative basis to believe that an entity

relevant to the litigation had done business with the bank, the Court would be obliged to quash it,

under Federal Rule of Civil Procedure 26. *Cf., e.g.*, *In re Glitnir banki hf.*, No. 08 Bk. 14757

(SMB), 2011 WL 3652764, at *5 (Bankr. S.D.N.Y. Aug. 19, 2011) (quashing subpoenas issued

to financial institutions on the grounds of relevance and undue burden); *Tattersalls Ltd. v.*

*Wiener*, No. 17 Civ. 1125 (BTM) (KSC), 2019 WL 13204024, at *2 (S.D. Cal. Nov. 19, 2019)

(same); *Ramirez v. World Mission Soc'y*, No. 14 Civ 1708 (JMV), 2019 WL 13397448, at *3

(D.N.J. May 14, 2019) (same).  And Section 1782's burden factor is intended to correspond to

the standards of U.S. civil litigation.  *See Mees*, 793 F.3d at 302.  Under these circumstances, the

Court finds the fourth *Intel* factor weighs heavily against Saul's application.

### 5.   **Weighing the Factors**

The *Intel* "factors are not to be applied mechanically," and a court "should also take into

account any other pertinent issues arising from the facts of the particular dispute." *Kiobel*, 895

F.3d at 245.

Here, the balance of the factors yields a clear outcome.  The *Intel* factors are either

neutral (the second factor) or weigh against the application (the first, third, and fourth factors).

And the fourth factor weighs particularly heavily.  The Court's determination that there is no

non-speculative basis for the subpoenas—that Saul proposes to issue these in grapeshot fashion

in the hope to discover accounts of his Brazilian adversaries—suggest that this application is "a

'fishing expedition'" with the potential to be "a vehicle for harassment" of Saul's siblings.  *In re

Request for Assistance from Ministry of Legal Affs. of Trinidad & Tobago*, 848 F.2d 1151, 1156

(11th Cir. 1988).  That consideration reinforces the Court's discretionary decision here to deny

the application.

As Judge Caproni explained in an analogous case:

Far from being an efficient means of assistance to participants in international
litigation, the subpoenas would direct sixteen large banks to conduct broad searches
for information when the [petitioner] has provided *no* basis to believe that [the
opposing parties in the foreign litigation] ever transacted business through any
particular bank.  That is too great a burden to impose on non-parties, particularly
on an *ex parte* basis.  The Court seriously doubts that this is the example Congress
intended to set by authorizing discovery pursuant to § 1782.

*In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d 701, 705 (S.D.N.Y. 2015).

Had there been a basis to pare the subpoenas down to focus them on record requests that were appropriate, the Court would have considered doing so, rather than deny relief outright. But the record here does not permit the subpoenas to be thus reformed, as Saul has not articulated a non-speculative factual basis to issue any of the subpoenas, even in narrowed form. The Court thus "is free to deny the application *in toto*." *Euromepa*, 51 F.3d at 1101. Approving the subpoenas on the present record would open up another front in the ongoing war within the unhappy Klein family, for no legally supportable reason. The Court declines to do so.

## CONCLUSION

For the foregoing reasons, the Court grants the movants' motions to quash the subpoenas. The Clerk of Court is respectfully directed to terminate all pending motions and to close this case.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: December 21, 2023
       New York, New York